Dorothy M. LOWE, Plaintiff,

v.

SURPAS RESOURCE CORPORATION, Ray Cash, and U.S. Bank, Defendants

No. 01–2149–JWL.

United States District Court, D. Kansas.

March 27, 2003.

Blair K. Drazic, Creve Coeur, MO, James F. Adler, Adler & Manson, Kansas City, MO, Robert Behan, Law Office of Robert Behan, Elm Mott, TX, James L. Renne, Arlington, VA, for Dorothy M. Lowe.

John C. Aisenbrey, Ann Michele Scarlett, Stinson Morrison Hecker, LLP, Kansas City, MO, for Ray Cash.

Sonya L. Allen, Office of State Bank Commissioner, Topeka, KS, Craig Raby, Consumer Protection & Adviocacy Section, Phoenix, AZ, for Arizona State Banking Dept.

Jeffrey D. Hanslick, John R. Phillips, Julia R. Somora, Blackwell Sanders Peper Martin LLP, Kansas City, MO, for Surpas Resource Corp.

Celia K. Garrett, Shook, Hardy & Bacon, L.L.P., Overland Park, KS, for US Bank N.A., N.D.

Michael T. Metcalf, David R. Vandeginste, Miller Law Firm, P.C., Kansas City, MO, for Experian Infromation Solutions, Inc.

## MEMORANDUM OPINION

LUNGSTRUM, District Judge.

Plaintiff Dorothy M. Lowe brought this action against Defendants Surpas Resource Corporation ("SRC" or "Surpas"), Ray Cash ("Mr.Cash"), and U.S. Bank (formerly "Mercantile" and "Firstar"). In the Final Pretrial Order ("PTO"), she alleges that defendants violated the Kansas Consumer Protection Act ("KCPA") and committed various torts and acts of negligence under Kansas common law in their attempts to collect debt from Ms. Lowe. Additionally, Ms. Lowe contends that U.S. Bank violated the federal Fair Credit Reporting Act by failing to investigate adequately her claims of identity theft and fraud.

On March 25, 2003, the court issued a summary order on defendants' summary judgment motions (Docs.170, 172, 175). Therein, the court granted in part and denied in part the motions filed by SRC and Mr. Cash. The court granted U.S. Bank's motion in its entirety. This Memorandum Opinion supplements the court's March 25, 2003 order.

## FACTUAL BACKGROUND

The following facts are either uncontroverted or construed in the light most favorable to Ms. Lowe, the nonmoving party. In June of 1994, Mercantile[1] received a credit card application, which identified plaintiff Dorothy M. Lowe as the primary applicant and her daughter Judith Figiel as the secondary applicant. The application appears to contain the signatures of both the primary and secondary applicants. Mercantile issued a Mercantile Visa Account and a Mercantile MasterCard Account in Ms. Lowe's name, in response to the application. From 1994 through 1997, charges were incurred and payments were made on both credit card accounts. All payments on the accounts stopped on November 7, 1997 and October 21, 1997 respectively, despite a remaining balance of $4,561.31 on the Visa account and $5,291.00 on the MasterCard account. Ms. Lowe contends that she is a victim of identity theft and fraud. She offers evidence suggesting that her daughter, Judith Figiel, and her son-in-law, Bernard Figiel (Judith's husband), opened these two accounts and incurred charges without her consent or authorization.[2]

 When payments ceased on the credit card accounts in late 1997, Mercantile attempted to collect the past due balances from Ms. Lowe. On September 17, 1997, James L. Renne (Ms. Lowe's grandson and formerly lead counsel in this litigation), acting as Ms. Lowe's durable power of attorney, drafted a letter disputing the validity of the charges on one of the Mercantile accounts.[3] In that letter, he states that "Ms. Lowe did not open or make purchases on this account nor has she authorized the opening of this account by another in her name ... Any transaction in her name is fraudulent."[4] In a sworn affidavit, Mr. Renne states that he mailed the correspondence, by first class mail,

1. Mercantile Bank retained its "Mercantile" name from 1995 through March 10, 2000, when it changed its name to "Firstar." Firstar changed its name to U.S. Bank in 2001. The court is referring to defendant U.S. Bank whenever it uses the names Mercantile or Firstar within this order.

2. Indeed, Ms. Lowe offers evidence that the alleged fraud committed by her daughter and son-in-law was not limited to the credit card accounts at issue in this proceeding. Janet Woodall, Ms. Lowe's daughter, swore in an affidavit that Mr. Figiel defrauded Ms. Lowe out of her entire life's savings and stole her mother's identity to open multiple credit card accounts, incurring balances up to $50,000 for his own personal use. U.S. Bank argues that the court should strike this evidence because it is "inconsistent with her deposition testimony" and constitutes a sham affidavit under *Lantec, Inc. v. Novell, Inc.,* 306 F.3d 1003, 1016 (10th Cir.2002). The court, however, does not believe there is a true conflict in Ms. Woodall's testimony. In her deposition testimony, Ms. Woodall noted that Mr. And Mrs. Figiel tended to Ms. Lowe's personal business beginning in 1992, and that she could not say with certainty that the charges on the Mercantile accounts were not legitimately made to provide Ms. Lowe with supplies or household items. While this testimony may expose limitations as to Ms. Woodall's knowledge concerning the charges on the Mercantile accounts, it is not irreconcilably inconsistent with her claim that her mother was in fact a victim of fraud.

3. Defendants also filed motions to disqualify James Renne from acting as trial counsel for Ms. Lowe (Docs. 198 and 199). The court considered his testimony for purposes of summary judgment and evaluated the consequences of such testimony separately in connection with the motions to disqualify, which the court granted in part at a hearing held on March 26, 2003.

4. Defendants argue that Ms. Lowe did not properly authenticate the letter, which was offered as Exhibit 3 in her response and attached as Exhibit 4 to U.S. Bank's original motion for summary judgment. Under D. Kan. Rule 56.1(d) "[a]ll facts on which a motion or opposition is based shall be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answers to interrogatories and responses to requests for admissions." "The Court will disregard a summary judgment exhibit which plaintiff has failed to

postage prepaid on that same day. Also in September of 1997, Janet Woodall answered a Mercantile collection call at Ms. Lowe's residence. Ms. Woodall told the Mercantile collector, Tina Jones, that Ms. Lowe disputed the validity of the accounts. In 1998, Ms. Woodall similarly disputed the validity of the debt with another Mercantile representative after the representative threatened to file charges against Ms. Lowe.[5]

When Mercantile's collection efforts failed, it assigned one of the accounts to Client Services, a debt collection agency, on July 6, 1998. Mercantile assigned the second account to Client Services on August 4, 1998.

 On March 1, 1999, Client Services received a letter from James L. Renne, which stated that "Dorothy M. Lowe did not authorize nor benefit from the Mercantile credit card accounts...[n]or did she

authorize or empower any other person to seek credit in her name...," and that "[s]he does not accept any responsibility for balances on these accounts."[6] Client Services notified Mercantile of the dispute on March 3, 1999.

On March 18, 1999 Mercantile sent Client Services a fraud affidavit for Ms. Lowe to sign and return. Mercantile requested Client Services forward the signed affidavit, once completed, so it could compare Ms. Lowe's signature on the affidavit with the one on the original credit card applications. Mercantile also requested that Client Services inquire whether Ms. Lowe knew the secondary cardholder, Judith Figiel. Mercantile also forwarded to Client Services copies of credit card statements that reflected the history of transactions on the two credit card accounts.

On August 25, 1999, Mr. Renne mailed another letter disputing the validity of the

properly authenticate." *Stevens v. Deluxe Fin. Serv., Inc.*, 199 F.Supp.2d 1128, 1144 n. 44 (D.Kan.2002). However, Mr. Renne states in his affidavit that the exhibit constitutes a valid copy of the letter that he mailed on September 17, 1997, which sufficiently authenticates the documents for purposes of summary judgment. *Id.* (finding that a declaration that the letter is a true and accurate copy of letter mailed sufficiently authenticated document for purposes of summary judgment).

5. These facts are based on statements contained in Ms. Woodall's affidavit. U.S. Bank argues that the court should strike these affidavit statements because Ms. Woodall testified in her deposition that she did not do anything *after* she heard about the alleged Mercantile debt, which contradicts her affidavit statements that she specifically disputed the validity of the debt. The court finds, however, that a reasonable juror could infer that Ms. Woodall both disputed the debt during the course of the 1997 telephone call and also failed to take immediate remedial steps thereafter. U.S. Bank further argues that the court should strike these affidavit statements because when asked to recall everything she could remember about her conversation with

the Mercantile employee, Ms. Woodall did not mention that she disputed the validity of her mother's debt. The court believes that this failure could simply reflect a failure to recall that specific part of the telephone conversation. Her subsequent recall in the affidavit, while potentially going to the credibility of such statements, does not inherently contradict her prior testimony. *See e.g., Greyhound Financial Corp. v. Willyard*, 1989 WL 201094, at *52 (D.Utah Dec.26, 1989) (noting that there is nothing "inherently inconsistent" between a failure to recall at one point and a recollection refreshed at another point in time).

6. SRC argues that Ms. Lowe failed to properly authenticate this and other letters contained in Exhibit 3. Some of these letters were signed by James Renne and others by Ms. Lowe. Mr. Renne has attested that these letters are accurate copies that were mailed to the recipients. Though Ms. Lowe did not attest to the accuracy of any of the copies, Mr. Renne's attestation is sufficient authentication because he had personal knowledge of the facts of the mailing of the letters and of their contents which put the recipient on notice.

credit card debt (signed by Dorothy M. Lowe) to Mercantile. Mr. Renne also attached an affidavit executed by Ms. Lowe on July 16, 1998, describing the fraudulent scheme allegedly employed by her daughter and son-in-law to acquire the Mercantile accounts.[7]

Also on August 25, 1999, Ms. Lowe sent letters to several credit reporting agencies disputing the validity of several reported debts, including the Mercantile accounts. After investigating Ms. Lowe's claims, the credit reporting agencies removed several debts from her credit report. Some of the credit reporting agencies indicated the Mercantile accounts would be deleted.

On October 14, 1999, after Consumer Resources failed to collect on the accounts, Mercantile assigned the accounts to Surpas Resources Corporation, another debt collection agency. At the time SRC received the accounts, Mercantile records did not indicate that Ms. Lowe had disputed the debt.

The relationship between SRC and Mercantile was governed by the Collection Agency Agreement. The Agreement provides that:

> The Agency shall perform all collection services under this Agreement as an independent contractor, and nothing contained herein shall be deemed to create any association, partnership, join[t] venture or relationship of employer or employee or principal and agent between the Agency and the Client.

Under the Agreement, Mercantile agreed to pay SRC a percentage of any amount they recovered from Ms. Lowe. SRC was not compensated based upon the number of hours devoted to collecting the accounts. Mercantile did not provide any office supplies or equipment to SRC, did not share a computer system with SRC, did not assist SRC in hiring employees or monitoring their work performance, and did not train or test Surpas' employees. Mercantile, however, was allowed to log onto SRC's computer system to view telephone records detailing SRC's collection efforts.

On October 16, 1999, SRC first initiated its efforts to collect from Ms. Lowe on the Mercantile accounts. From that date through January 21, 2000, SRC made approximately 20 direct contacts with the plaintiff, 2 direct contacts with her attorney and grandson James Renne, 5 direct contacts with members of her family, and left 9 voice messages at her residence. During this time, defendant Ray Cash was employed by SRC as an assistant manager. SRC did not conduct a background check or investigation prior to hiring Mr. Cash. Mr. Cash misrepresented the extent of his education in his resume.

As to the direct collection calls Ms. Lowe received during this time period, she does not specifically recall the identity of the collection callers or the agencies that they represented. SRC, however, was the only collection agency attempting to collect debt from Ms. Lowe during this time period.[8] As to the substance of the conversa-

---

7. Mercantile disputes receipt of this letter, but Mr. Renne states in his affidavit that he mailed the letter and affidavit by first class mail, postage prepaid on August 25, 1999. *Witt v. Roadway Exp.*, 136 F.3d 1424, 1430 (10th Cir.1998) ("A rebuttable presumption of receipt does arise on evidence that a properly addressed piece of mail is placed in the care of the postal service.")

8. In her reply, Ms. Lowe cites the deposition testimony of James Renne wherein he states

that based on all available information SRC made all the collection calls during this time period to controvert the facts alleged in ¶¶ 18 and 19 of SRC's statement of uncontroverted facts. In its reply, SRC generally alleges that Ms. Lowe failed to specifically controvert its statement of facts and/or failed to refer with particularity to admissible evidence in support of her purported controversion in ¶¶ 8–9, 13–20, 23–78, 80–88, and 90–101. SRC does not specifically challenge the admissibility of

tions and the tactics employed during the course of these collection efforts, Ms. Lowe specifically recalls that the collectors threatened her with aggressive legal action and threatened to take her home from her. On two occasions, one in November of 1999 and the other in January of 2000, another grandson of Ms. Lowe, Mark Renne, listened in on the collection calls. Mark Renne testified that during the course of these collection calls SRC employee Ray Cash called Ms. Lowe a "low life" and a "thief," threatened to take her home and threatened to personally come to her house to take care of the situation.[9] SRC caught Mr. Cash making similar threats to other debtors in January and February of 2000, resulting in his discipline and subsequent termination. Finally, during the course of many of these collection calls, Ms. Lowe disputed the validity of the debt, informed the callers that her attorney and grandson James Renne was handling the matter, and requested they cease their collection efforts.

As to the direct contacts with Ms. Lowe's family members and her grandson, SRC communicated that it would pursue aggressive legal tactics against Ms. Lowe if she did not make payment on the accounts. Family members communicated to SRC that Ms. Lowe was a victim of fraud. Also, on two occasions, Mr. James L. Renne contacted SRC employees Cassandra Bailey and Ray Cash. On November 15, 1999 he spoke with Ms. Bailey, who confirmed that she was attempting to collect debt on two Mercantile credit card accounts. Mr. Renne requested that SRC stop calling his grandmother because the

debt was invalid. On November 10, 1999, Mr. Renne informed Mr. Cash that the accounts were opened without Ms. Lowe's consent. Mr. Cash threatened that Mr. Renne's grandmother could face civil and criminal litigation.

As to the voice messages, the recordings were left on SBC's Callnotes®, which is a voice mail system that allows a user to receive messages from anywhere without an answering machine. James Renne, not Ms. Lowe, set up the answering service on Ms. Lowe's home number and he retrieved and listened to all the messages. Ms. Lowe did not retrieve or listen to the messages left on the service. James Renne made tape recordings of two of the messages from Mr. Cash. During the first message that Mr. Cash left on October 28, 1999, he "wished [Ms. Lowe] good luck" if she chose not to return the call and that the situation would be "rectified with or without [her] cooperation." During the second message that Mr. Cash left later that same day, he indicated that Ms. Lowe's attorney had still not contacted him. There is no evidence that James Renne actually communicated the substance of these or any other voice messages to Ms. Lowe.

In addition to the telephone calls, SRC sent collection letters to Ms. Lowe on October 20, November 17, December 1, and December 10, 1999. SRC last contacted Ms. Lowe on January 21, 2000. It closed the two Mercantile accounts on May 6, 2000 after concluding that it had exhausted all efforts to collect the alleged debt. On April 11, 2001, however, SRC restored one

---

Mr. Renne's testimony and the court believes it specifically controverts SRC's facts suggesting that other agencies were calling Ms. Lowe at the time. Thus, viewing the evidence in the light most favorable to Ms. Lowe, the court assumes for purposes of this motion that SRC was the only agency attempting to

collect from her during the relevant time period.

9. Defendants challenge the validity of Mark Renne's identification of Mr. Cash, but the challenge goes to the credibility of his testimony. As such, the court must properly consider the evidence for purposes of this motion.

of the accounts from its archives for some unknown reason and added it to the call list. As a result, SRC attempted to contact Ms. Lowe on May 1, 2001, but no one answered the telephone call.

As a result of these contacts, Ms. Lowe often became nervous, upset and anxious. According to deposition testimony, this distress caused her to tremble, shake, cry and sometimes lose sleep. Ms. Lowe's medical records, however, do not indicate that she suffered any physical injury or mental distress during the time of the collection calls, nor did she mention these calls to her physician. In June of 2001, Ms. Lowe was diagnosed with Alzheimer's disease. On at least two occasions, Ms. Woodall, plaintiff's daughter, told an SRC caller that her mother was "too old" to be bothered with the calls. On several other occasions, Ms. Lowe told SRC that an attorney was managing her financial affairs. SRC records, however do not suggest or indicate that it had knowledge that Ms. Lowe suffered from a debilitating disease or that she was otherwise susceptible to emotional distress.

On August 21, 2000, Mercantile sold the accounts to Collins Financial Services, but repurchased them in August of 2002, after it received notice that Ms. Lowe had filed a complaint against SRC. Collins Financial Services did not attempt to collect on these accounts or have any correspondence with Ms. Lowe. Neither Mercantile nor its successors attempted to collect from Ms. Lowe after SRC exhausted its efforts in May of 2000.

On April 2, 2001, Ms. Lowe filed her initial complaint against SRC, Mr. Cash and "John and Jane Does 1–5." Plaintiff amended her complaint on June 21, 2002, to add claims of negligent hiring, retention and supervision against SRC and to add U.S. Bank as a defendant. Defendants filed their motions for summary judgment on January 27, 2003.

## STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the exhibits in proper disposition of the claim." *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.,* 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guarantee & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler,* 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."

*Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma,* 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams,* 233 F.3d at 1246.

The court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## ANALYSIS

### I. Kansas Consumer Protection Act Claims

In Ms. Lowe's first theory of recovery, she alleges that the defendants SRC and Ray Cash engaged in deceptive and/or unconscionable acts, in violation of the KCPA, while attempting to collect on two Mercantile credit card accounts. Ms. Lowe asserts these KCPA claims against U.S. Bank under a theory of vicarious liability and also asserts other KCPA claims directly against U.S. Bank.

### A. Claims Asserted against Defendants Cash and SRC

Defendants SRC and Cash contend that the KCPA claims should be dismissed in part or in their entirety because: (1) Ms. Lowe does not know whether defendants as opposed to other collection agencies and employees made the telephone calls that form the basis of this claim; (2) telephone calls to which Ms. Lowe was not a party and voice messages that she did not receive are not actionable under the KCPA; (3) there is no admissible evidence to establish the content of the collection calls; and (4) the Act does not permit her to recover to the extent that she requests. The court addresses each of these arguments in turn.

### 1. Whether Ms. Lowe can Establish that Defendants Made the Alleged Collection Calls

In the PTO, Ms. Lowe alleges 97 separate violations of the KCPA during purported conversations between SRC (often through employee Ray Cash) and the plaintiff. Defendants contend that Ms. Lowe cannot establish a genuine issue of material fact on several of these KCPA claims because she cannot prove the identity of the collection callers.

### a. Identity of Surpas

██ Defendant SRC challenges two categories of collection calls. First, it contends that it did not contact Ms. Lowe on October 25, 29, or 30, 1999, as she alleges in paragraphs 7a(2)a1, 2, 19, 25, and 26 of the Pretrial Order.[10] In support of this

10. SRC's argument could potentially raise two distinct issues: first, whether Ms. Lowe received collection calls on October 25, 29, and 30, 1999; and second, whether SRC was the entity that placed those calls. The thrust of SRC's argument, however, is not that Ms. Lowe did not receive collection calls on those dates, but instead whether SRC was the party to the allegedly improper collection calls. Thus, for purposes of summary judgment, the court will focus on the issue of identity. However, at trial, if Ms. Lowe seeks to recover statutory damages for each separate

argument, Surpas relies on its telephone records that detail the date, time and substance of telephone calls made to alleged debtors. Surpas' records reveal that an employee attempted to contact Ms. Lowe on October 30, 1999, but that no one at the residence answered the call. The records further indicate that SRC did not attempt to contact Ms. Lowe on October 25, or October 29, 1999. Moreover, Ms. Lowe testified that she does not recall the identity of anyone who contacted her regarding the debts.

This evidence places the burden upon Ms. Lowe to "set forth specific facts showing that there is a genuine issue for trial." To that end, Ms. Lowe cites to the deposition of James L. Renne, wherein he testifies that SRC was the only agency placing collection calls to Ms. Lowe from October of 1999 through May of 2000. Second, Ms. Lowe points to SRC's admission that it made at least 20 direct contacts with the plaintiff, 2 direct contacts with her attorney, 5 direct contacts with her family, and left 9 messages at her residence during the relevant time period (October 16, 1999 through January 21, 2000) to suggest that SRC was, more likely than not, the entity that originated the calls. Ms. Lowe further offered evidence that another grandson, Mark Renne, listened in on two collection calls initiated by SRC's agent, Ray Cash. While much of this evidence is circumstantial, the court finds that a rational trier of fact could find, based upon this evidence, that SRC was more likely than not the entity that made the calls on or about the dates alleged in paragraphs 7a(2)a1, 2, 19, 25, and 26 of the PTO.

Second, SRC contends that it was not the collection agency that called Ms. Lowe, while her caregiver, Theresa Hernandez, listened on another line (as alleged in paragraphs 82 through 86 of the PTO). In support of this argument, SRC notes that Ms. Hernandez testified that she listened in on phone calls from an unidentified collection agency shortly after she began working for Ms. Lowe in October or November of 1998. Surpas, however, did not initiate its collection efforts against Ms. Lowe until October 16, 1999. Moreover, other entities were attempting to collect the same debt from Ms. Lowe beginning in 1997 through 1999. In her response, Ms. Lowe failed to set forth any specific facts to challenge Surpas' argument. She alleges that Ms. Hernandez was mistaken about the year she began working for her and, therefore, the date she first heard the collection calls. Ms. Lowe, however, fails to offer any evidence to support this allegation. As such, Ms. Lowe has failed to establish a genuine issue of material fact as to the identity of the caller who attempted to collect debt from Ms. Lowe, while Ms. Hernandez listened in on the other line. Summary judgment is granted as to any KCPA claims that specifically rely on those contacts (which SRC identifies to be paragraphs 7a(2)a82–86 of the Pretrial Order).

### b. Identity of Defendant Cash

Similarly, Mr. Cash challenges the identity of the caller implicated in paragraphs 7a(2)a1–2 of the PTO. In those paragraphs, Ms. Lowe alleges that on or about October 29, 1999, Ray Cash *or another male employee of Surpas* engaged in collection efforts in violation of the KCPA. Mr. Cash contends that Ms. Lowe cannot establish that he made those calls on October 29, 1999.[11] In support of this argu-

---

wrongful collection effort, she must establish both that SRC made the collection call and that it occurred on or about a specific date.

**11.** As explained in supra note 10, this argument could potentially raise two distinct is-

sues: whether Ms. Lowe received collection calls on a particular date and whether Mr. Cash placed those calls. The court again will focus on the identity issue.

ment, Mr. Cash notes that Surpas' records indicate that he telephoned plaintiff's home number on only four occasions and never on October 29, 1999.[12] Mr. Cash testified during his deposition that he never spoke directly to Ms. Lowe and plaintiff testified she does not recall speaking to a male debt collector. Based on this evidence, Mr. Cash believes he is entitled to summary judgment as to the allegations contained in paragraphs 7a(2)a1–2 of the PTO.

Again, this evidence places the burden on Ms. Lowe to "set forth specific facts showing that there is a genuine issue for trial." To that end, Ms. Lowe offers internal memorandum wherein Mr. David Russo reports to SRC that Mr. Cash made threats (to pursue legal action and to take away a creditor's home) similar to those alleged in paragraphs 7a(2)a1–2 of the PTO to other debtors. Also, as noted above, Mark Renne listened in on two calls between Ms. Lowe and a male debt collector, who he later identified as Mr. Cash.[13] Ms. Lowe further challenges Mr. Cash's reliance on Surpas' telephone records because collection employees can subsequently alter their contents in SRC's computer system. The court finds that this evidence creates a genuine issue of material fact as to whether Mr. Cash made the telephone contacts alleged in 7a(2)a1–2 of the PTO and summary judgment is denied on this ground.

### 2. Liability for Communications that Ms. Lowe Never Received

■ The KCPA provides relief to consumers aggrieved by a violation of the Act. Defendants contend that Ms. Lowe cannot, as a matter of law, be aggrieved by communications she never received. Specifically, in paragraphs 7a(2)a 37–63, 69–70, 89, 94 and 96 of the PTO, Ms. Lowe alleges that SRC violated the KCPA during conversations with her lawyer and/or family members.[14] In paragraphs 7a(2)a 5–10, 13, 16, 27, and 32–33 she alleges that SRC violated the KCPA in messages she never heard and that her lawyer retrieved from her voice mail system. Because she never received these communications, defendants argue that they are not actionable under the KCPA.

■ The KCPA provides that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." K.S.A. § 50–626(a). The KCPA further restricts suppliers from engaging "in any unconscionable act or practice in connection with a consumer transaction." K.S.A. § 50–627(a). The Act contemplates that a *"consumer who is aggrieved by a violation* of this act may recover, but not in a class action, damages or a civil penalty as provided in subsection (a) of K.S.A. 50–636 and amendments thereto, whichever is greater." K.S.A. § 50–634(b) (emphasis added).[15] The Kan-

---

**12.** Surpas records indicate that there was no answer at the residence on two of the four attempts and that Mr. Cash left a message on CallNotes® on the other two attempted contacts.

**13.** Mr. Cash, however, contends that Mark Renne's testimony regarding the content of those telephone calls makes it clear that they were not the same calls identified in paragraphs 7a(2)a1–2 of the PTO. Even if this is true, the evidence contradicts Mr. Cash's claim that he never spoke directly to Ms. Lowe.

**14.** Mr. Cash also notes that the claims contained in paragraphs 7a(2)a 37–53 are based upon conversations that occurred between him and James Renne. Also, the claims asserted in paragraphs 7a(2)a 89–92, 94–96 are based on conversations between Mr. Cash and Mark Renne. Paragraph 95, however, alleges that an employee of Surpas violated the KCPA in a "conversation in which Dorothy Lowe and her grandson Mark were on the line..." As such, this paragraph is not subject to defendant's causation argument.

**15.** Similarly, K.S.A. § 50–636(a), the civil penalty provision referenced in this subsec-

sas Supreme Court has held that a consumer is not automatically entitled to § 50–634 remedies each time a supplier violates the Act. Instead, the consumer must demonstrate that the violation was causally connected to the consumer's damages to be entitled to these remedies. *Finstad v. Washburn Univ. of Topeka,* 252 Kan. 465, 845 P.2d 685 (1993).

In *Finstad,* students who enrolled in Washburn's court reporting program alleged that the University violated the KCPA by representing in an academic course catalogue that its program was accredited when in fact the National Shorthand Reporters Association had not yet certified it. *Id.* at 688. Many of the students, however, enrolled in the program before the catalogue was published or without knowledge of the error in the catalogue. *Id.* The students claimed that they were "aggrieved" consumers under the KCPA because they paid tuition for a program that was not accredited. *Id.* The students, however, did not suggest that they were "induced to enroll in the program by the false statement that [the court reporting program] was accredited..." *Id.* That is, "the students did not demonstrate a causal link between Washburn's false statement and their injuries." *Id.* The trial court granted summary judgment against the plaintiffs on those grounds. On appeal, the students argued that the KCPA did not require a causal connection between the misrepresentation and the grievance. *Id.* at 689. Instead, appellants argued that "all they need to show for recovery is that they are consumers who are engaged in a consumer transaction with defendant and that defendant committed a deceptive act or practice under the Act." *Id.* The Kansas Supreme Court disagreed, arguing that the plain language of the statute provides relief only

to those consumers aggrieved (i.e. those who suffer loss or injury) because of a violation of the Act. *Id.* at 689 (noting that "[i]f the students are not aggrieved by the violation, then they do not have a remedy under K.S.A. 50–634(b)"). The court refused to "interpret an aggrieved consumer to be one who is neither aware of nor damaged by a violation of the Act..." and concluded that "the district court did not err in holding that a causal connection is still required to maintain an action under K.S.A. 50–634(b)..." *Id.* at 692.

■ The defendants rely on *Finstad* to argue that, as a matter of law, Ms. Lowe cannot be aggrieved by calls to which she was not a party or voice messages that her attorney retrieved. Indeed, in *Finstad,* the court refused to interpret an aggrieved consumer as one who is neither aware of nor damaged by a violation of the act. Unlike *Finstad,* however, where the misrepresentations in a course catalogue did not induce students to enroll in the court reporting program, here Ms. Lowe has demonstrated a genuine issue of material fact as to whether she was "damaged" by the alleged violations of the KCPA. The KCPA does not define the term "aggrieved." In *Finstad,* the court defined the term as " '[h]aving suffered loss or injury.' " 845 P.2d at 690 (quoting Black's Law Dictionary 65 (6th ed.1990)). Moreover, in *Petition of Kansas City,* 190 Kan. 308, 374 P.2d 35 (1962), the Kansas Supreme Court defined the term "aggrieved" in the context of G.S.1949, 12–502a as follows:

A party is aggrieved whose legal right is invaded by an act complained of or whose pecuniary interest is directly affected by the order. The term refers to a substantial grievance, a denial of some personal or property right, *or the impo-*

tion, provides that "[t]he commission of any act or practice declared to be a violation of

this act shall render the *violator liable to the aggrieved consumer..."* (Emphasis added).

*sition upon a party of some burden or obligation.* In this sense it does not refer to persons who may happen to entertain desires on the subject, but only to those who have rights which may be enforced at law and whose pecuniary interest may be affected.

*Id.* at 41 (emphasis added). Here, SRC's collection calls imposed upon Ms. Lowe the *burden* of retaining the assistance of third parties to respond to SRC's inquiries.[16] Ms. Lowe specifically directed SRC's agents to contact James Renne regarding the collection matter. Though Ms. Lowe was not a party to all of the collection calls and voice messages, her agents and family members received these communications and responded to them on her behalf. Moreover, as her attorney, James Renne had a duty to communicate the subject matter of these collection efforts to Ms. Lowe. As such, the court cannot conclude, as a matter of law, that the calls to her attorney and other family members and the voice messages retrieved by her attorney did not incrementally add to Ms. Lowe's "burden." As such, she has demonstrated a genuine issue of material fact that she was "aggrieved" by these telephone calls.

### 3. Genuine Issue of Fact as to Content of the Conversations

■■■ SRC and Mr. Cash argue that for many of the alleged KCPA violations Ms. Lowe has either no evidence or only inadmissible evidence[17] establishing the content of the conversations during the collection calls.

First, as to the claims asserted in paragraphs 7a(2)a11–18, 20–24, 27–29, 31–35, 64–68, 71–81, and 97 of the PTO, SRC contends that Ms. Lowe has no evidence to support the content of those communications. In support of that argument, SRC notes that Ms. Lowe has not identified any witness who can testify to the content of the claimed conversations and that she does not recall the substance of those calls. Thus, SRC argues that the substance of the allegedly unlawful collection efforts are founded upon bald assertions that are not supported by any evidence. In response, Ms. Lowe cites to sections of her deposition testimony where she recalls that the debt collectors made various threats to pursue legal action and also threatened to take away her home. Ms. Lowe also notes that Mark Renne listened in on two debt collection calls wherein Mr. Cash called her a thief and a low-life, threatened to come to her home, and threatened to take away her home. Finally, SRC's conversations with Ms. Lowe's family members and the voice messages tend to corroborate Ms. Lowe's recollection of the subject matter and tactics employed by SRC and Mr. Ray Cash. Taken as a whole, this evidence creates a genuine issue of material fact as to the subject matter of the conversations alleged in paragraphs 7a(2)a11–18, 20–24, 27–29, 31–35, 64–68, 71–81, and 97 of the PTO. As such, the court denies summary judgment on this particular ground for relief.

---

16. The KCPA does not suggest that a consumer must suffer a pecuniary loss to be aggrieved. Thus, whether or not Ms. Lowe compensated James Renne is not determinative of whether she was aggrieved by the acts of SRC and Mr. Cash.

17. SRC also argues that James Renne is the only witness who can testify as to the substance of the communications alleged in ¶¶ 7a(2)a3, 4, 30 and 36 of the PTO, but that he has repeatedly invoked the attorney-client privilege as to other conversations with Ms. Lowe. According to SRC, Ms. Lowe cannot use her communications with James Renne as both a sword and a shield. The court considers this evidence for purposes of summary judgment, but has instructed counsel that they may re-depose James Renne regarding other conversations with Ms. Lowe.

#### 4. Limitation on Damages under the KCPA

Defendants contend that Ms. Lowe is not entitled to multiple recoveries under the KCPA, based on the same wrongful act. Additionally, defendants argue that Ms. Lowe has overstated the amount of permissible statutory damages and that the damage enhancement (available for KCPA violations against the elderly or disabled) does not apply in this action.

##### a. Multiple Claims Based upon a Single Utterance

■■■■■ SRC contends that a single act or practice cannot constitute multiple violations of the KCPA. Plaintiff does not dispute this argument and informs the court that she is not attempting to claim multiple recoveries based upon a single utterance. To the extent that Ms. Lowe does seek multiple violations based on a single utterance made during the course of a collection call, summary judgment is granted as to the duplicitous claims.[18]

##### b. Limitation on the Amount of Statutory Damages

Ms. Lowe claims she is entitled to $20,000 for each violation of the KCPA: $10,000 for each violation pursuant to K.S.A. § 50–636 and an additional $10,000 enhancement for each violation pursuant to K.S.A. § 50–677 because the violation was committed against an elder or disabled person. Defendants believe that Ms. Lowe is entitled to only $5,000 per violation, which was the statutory penalty in place at the time they allegedly committed the wrongful acts. SRC and the other defendants also argue that the enhancement does not apply because there is no evidence that they knew or should have known plaintiff was elderly or that she was disabled when it contacted her.

As to the statutory penalty, Ms. Lowe admits that the Legislature increased the civil penalty from $5,000 to $10,000 after defendants completed their alleged wrongful acts and "acknowledges that defendant is correct on this issue." Thus, the court grants summary judgment to the extent that Ms. Lowe seeks civil penalties under K.S.A. § 50–636 in excess of $5,000 per each violation of the KCPA. *See, e.g., State ex rel. Stephan v. Commemorative Serv. Corp.,* 16 Kan.App.2d 389, 823 P.2d 831, 839 (1991)(finding that "[o]ur system of justice does not permit the imposition of ex post facto penalties for actions committed prior to the creation of those penalties").

■■■■■ As to the enhancement, which Ms. Lowe apparently seeks based upon her elderly status, the court finds that summary judgment is not proper at this stage of the proceedings. Kansas law provides that "[i]f any person is found to have violated any provision of the Kansas consumer protection act, and such viola-

---

18. The court, however, does not necessarily agree with Surpas that "in the context of telephone calls, each call is an act or practice, not each word spoken in the call." The KCPA provides aggrieved victims with the right to recover damages for each *separate violation* of the act. Within one telephone conversation (just as in one contract, advertisement, brochure, etc.), it is conceivable that a supplier could engage in more than one of the eleven deceptive acts or practices that the Kansas Legislature has determined to be per se violations of the KCPA. K.S.A. § 50–626(b). In certain circumstances each misrepresenta-

tion could proximately cause separate and discrete injuries. It seems wholly inconsistent with the Legislature's express mandate to construe the Act broadly (to protect consumers from suppliers who commit deceptive and unconscionable practices) to reward a supplier (by limiting damages) that incorporates successfully all of its wrongful conduct in one discrete encounter. Necessarily, then, the determination of what actually constitutes a violation in any given case must be made on the specific circumstances in question. Here, that inquiry should be deferred to the time of trial.

tion is committed against elder or disabled persons, in addition to any civil penalty otherwise provided by law, the court may impose an additional civil penalty not to exceed $10,000 for each such violation." K.S.A. § 50–677. In determining whether to impose this enhancement the court is required to consider a number of factors including "whether the defendant knew or should have known that the defendant's conduct was directed to an elder or disabled person." K.S.A. § 50–678(b). However, a defendant's knowledge of the plaintiff's status is not a necessary precondition for imposing the penalty, but instead, it is merely one of several factors the court must consider before imposing the enhanced civil penalty. In any event, the court cannot say as a matter of law that Ms. Lowe would not be entitled to the enhanced penalty, should she ultimately prevail on one of her KCPA claims. As such, the court denies summary judgment on this issue.

In short, the court finds that Ms. Lowe has created a genuine issue of material fact as to the identity of the callers, except for the collection calls Ms. Lowe allegedly received while her caretaker, Ms. Hernandez, listened on the other line. As to those calls, summary judgment is granted because Ms. Lowe has failed to offer evidence from which it could be established that defendants placed those calls. Additionally, the court denies defendants' motion for summary judgment as to all collection calls and conversations to which Ms. Lowe was not a party (calls to family members and her attorney when Ms. Lowe herself was not on the line) and voice messages she did not retrieve because she has demonstrated a genuine issue of material fact as to whether she was "aggrieved" by such communications. The court further finds that Ms. Lowe has created a genuine issue of material fact as to the subject matter and substantive content of the collection calls as well as the tactics

employed by defendants in attempting to collect the alleged debt from her. Finally, the court finds that while Ms. Lowe cannot recover multiple penalties for a single utterance under the KCPA, she may recover statutory damages, which are limited to $5,000 per violation (the penalty in place at the time of the alleged wrongdoing), for each separate violation of the Act. Moreover, the court does not find, at this stage of the proceedings, that Ms. Lowe is legally barred from recovering a statutory enhancement based upon her age and/or disability under K.S.A. § 50–677, should she ultimately prevail on one of her KCPA claims.

**B. Claims Asserted Against Defendant U.S. Bank**

Ms. Lowe also asserts KCPA claims against U.S. Bank under a theory of vicarious liability as well as claims directly against U.S. Bank. Ms. Lowe has failed to create a genuine issue of material fact as to either one of these theories.

**1. Vicarious Liability of U.S. Bank for the Acts of SRC and Mr. Cash**

 "As a general rule, when a person (a contractee) lets out work to another and reserves no control over the work or workmen, the relation of contractee and independent contractor exists, and not that of master and servant, and the contractee is not liable for the negligence or improper execution of the work by the independent contractor." *Falls v. Scott,* 249 Kan. 54, 815 P.2d 1104, 1109 (1991) (citing *Balagna v. Shawnee County,* 233 Kan. 1068, 668 P.2d 157 (1983)). In *Falls,* the Kansas Supreme Court defined an independent contractor relationship and set forth the general test for distinguishing that relationship from an employer-employee.

An independent contractor is defined as one who, in exercising an independent employment, contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the results or product of his work. The primary test used by the courts in determining whether the employer-employee relationship exists is whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished. It is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor.

*Id.* at 1112 (citing *Wallis v. Sec'y of Kan. Dept. of Human Res.*, 236 Kan. 97, 689 P.2d 787 (1984)). "Although the right of control test is the most important single consideration in determining the relationship, it is not exclusive—other relevant factors are also to be considered." *McDonnell v. Music Stand, Inc.*, 20 Kan. App.2d 287, 886 P.2d 895, 899 (1994) (citing *Jones v. City of Dodge City*, 194 Kan. 777, 402 P.2d 108 (1965)). In addition to this general rule, the Restatement (Second) of Agency § 220(2) (1957) sets out several relevant factors to consider when deciding whether one is an employee or an independent contractor, including:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

The Kansas Supreme Court has recognized that these factors are helpful in determining whether the court should consider an entity to be an employee for purposes of imputing fault. *Brillhart v. Scheier*, 243 Kan. 591, 758 P.2d 219, 223 (1988). Generally, the question whether an entity is an agent or an independent contractor is a question of fact for the jury, but where "the facts are undisputed or the evidence is susceptible of only a single conclusion, it is a question of law for the court whether one is an employee or an independent contractor." *Falls*, 815 P.2d at 1112. Moreover, in this case, SRC and U.S. Bank's relationship was governed by an unambiguous written contract and "the interpretation of that agreement is properly a matter of law." *Knorp v. Albert*, 29 Kan.App.2d 509, 28 P.3d 1024, 1027 (2001).

 After considering these factors, the court finds that the evidence is susceptible to only one conclusion: that SRC was an independent contractor and not an employee of U.S. Bank. First, while the agreement permits U.S. Bank to review SRC's collection efforts, it does not authorize U.S. Bank to exercise any control over the manner in which SRC attempts to

collect the debts. Second, SRC's business is dedicated to the collection of debt and U.S. Bank employed SRC for those distinct services. Third, U.S. Bank did not provide any office supplies or equipment to SRC under the terms of the Agreement, did not share a computer system with SRC, did not assist SRC in hiring employees or monitoring their work performance, and did not train or test SRC employees. Fourth, under the agreement, SRC was paid by the job, i.e., a percentage of each account collected, instead of by the hour. Fifth, the parties believed they were creating an independent contractor relationship, as evidenced by the unambiguous language in the agreement that SRC was to "perform all collection services under this Agreement as an independent contractor, and nothing contained herein shall be deemed to create any association, partnership, join[t] venture or relationship of employer and employee or principal and agent between [SRC] and [U.S. Bank]." The court recognizes that either party could terminate the contract upon written notice and that U.S. Bank had great latitude to review SRC collection activity, but these facts do not suggest that U.S. Bank retained the type of control over SRC necessary to establish an agency relationship[19] or that could overcome the unambiguous intent of the contracting parties. *McDonnell*, 886 P.2d at 899 (finding collection agency was independent contractor, despite language in contract using the term "agent," because creditor did not have right to control how the contractor would collect, contractor was paid a commission on accounts, and power to terminate was equally conferred on both parties).[20]

■ Ms. Lowe, however, also argues that the general rule of non-liability does not apply because U.S. Bank had non-delegable statutory duties under state and federal law. The Restatement of Torts recognizes that "[o]ne who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions." Restatement (Second) of Torts § 424 (1965). Ms. Lowe suggests that the duties imposed upon creditors and debt collectors under the Kansas Consumer Protection Act, the Fair Debt Collection Practices Act and the Fair Credit Reporting Act are sufficiently analogous to "safeguards or precautions for the safety of others" to fall within this exception to the rule of non-liability for the acts of independent contractors. In support of its position, Ms. Lowe relies on *Clark v. Assoc. Commercial Corp.*, 877 F.Supp. 1439 (D.Kan.1994). In *Clark*, the court found that defendant had a statutory obligation

**19.** U.S. Bank's right to review collection efforts reflects its concern with the results of SRC's work, not to the method of collection, and such authority does not indicate the type of control that would create an agency relationship under Kansas law. *See McDonnell*, 886 P.2d at 899.

**20.** In *Griffin v. Sec. Pacific Auto. Fin. Serv. Corp.*, 995 F.Supp. 1266 (D.Kan.1998), the court reached the opposite conclusion. In *Griffin*, however, there was no evidence suggesting that the parties clearly intended that the collection agency would perform its services as an independent contractor. Here, the Collection Agency Agreement, clearly expresses such intent. Moreover, in *Griffin*, the court did not explain why *McDonnell* did not control the outcome. The court finds that the reasoning in *McDonnell* is more persuasive and more likely reflects the position that the Kansas Supreme Court would adopt. *See Fransen v. Conoco, Inc.*, 64 F.3d 1481, 1492 n. 10 (10th Cir.1995) ("decisions of a state's intermediate appellate courts are some evidence of how the state supreme court would decide the issue")

to take precautions against a breach of the peace during repossession. Thus, even though defendant hired an independent contractor to repossess the property, the duty to take precautions against a breach of the peace remained with the defendant. *Id.* at 1447. That duty remained with the defendant because under Tennessee law, which governed the question before the court, it is non-delegable, and thus, "a secured party is vicariously liable for wrongful acts of the repossessor even if the repossessor is an independent contractor." *McCall v. Owens,* 820 S.W.2d 748, 751–52 (Tenn.Ct.App.1991).

 Not all statutes, however, impose affirmative obligations that constitute non-delegable duties. While the Kansas Consumer Protection Act prohibits deceptive and unconscionable acts, that obligation is imposed on all suppliers, not just creditors similarly situated to U.S. Bank. Ms. Lowe fails to identify any affirmative, non-delegable duty under the KCPA. Likewise, the Fair Debt Collection Practices Act ("FDCPA") does not impose non-delegable duties upon U.S. Bank. Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors," 15 U.S.C. § 1692(e), and its provisions apply almost exclusively to debt collectors, which the statute defines as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or assert-

ed to be owed or due another." 15 U.S.C. § 1692a(6). Thus, actual creditors, such as U.S. Bank, are not generally subject to the Act. *McGrady v. Nissan Motor Acceptance Corp.,* 40 F.Supp.2d 1323, 1335 (M.D.Ala.1998). Finally, Ms. Lowe fails to identify any specific non-delegable duties imposed upon U.S. Bank under the FCRA. The FCRA prohibits all individuals, not just creditors, from misusing credit information, and as such, does not specifically impose non-delegable duties on creditors. *See, e.g., Del Amora v. Metro Ford Sales and Serv., Inc.,* 206 F.Supp.2d 947, 953 (N.D.Ill.2002) (creditor did not violate non-delegable duty under FCRA when employee violated obligation to refrain from using or obtaining credit reports for improper purposes because protection applied to "all persons").[21]

Because U.S. Bank is not vicariously liable for the acts of its independent contractor, SRC, or SRC's employee, Mr. Cash, the court grants U.S. Bank's motion for summary judgment on this issue. Therefore, Ms. Lowe's KCPA, invasion of privacy, outrage and negligent hiring, supervision and retention claims,[22] to the extent Ms. Lowe bases them on a theory of vicariously liability, are dismissed as to U.S. Bank.

**2. KCPA Claims Asserted Directly Against U.S. Bank**

 Ms. Lowe argues that U.S. Bank (Mercantile at the time) directly violated the KCPA by misrepresenting to SRC and Collins Financial Services[23] that the Mer-

---

**21.** Moreover, Ms. Lowe did not plead that SRC violated the FCRA and the court only permitted her to amend her complaint to add the claim against U.S. Bank. Thus, to the extent SRC did violate some "non-delegable" duty under that Act, Ms. Lowe did not preserve that claim.

**22.** The court understands that Ms. Lowe has asserted a separate negligence claim against

U.S. Bank, based on its employment of SRC. As to that claim, Ms. Lowe does not rely on a theory of vicarious liability and it is not therefore subject to dismissal on these particular grounds.

**23.** Ms. Lowe actually alleges that sometime between September 1999 and the present, U.S. Bank falsely represented to a collection entity other than SRC that the debt was valid.

cantile credit card debts were constituted valid and collectible debt. U.S. Bank argues that summary judgment is appropriate because, among other arguments, Ms. Lowe "has not alleged that Mercantile or its successors made any misrepresentation to her, or withheld any information from her." Indeed, in her first theory of recovery in the pretrial order, her KCPA claims appear to be based upon misrepresentations made from U.S. Bank to SRC and Collins Financial Services regarding the validity of the accounts. The question is whether these misrepresentations, which were not made directly to Ms. Lowe, are actionable under the KCPA.

As noted above, the KCPA provides that "[n]o supplier shall engage in any deceptive act or practice *in connection with a consumer transaction.*" K.S.A § 50–626(a) (emphasis added). A consumer transaction "means a sale, lease, assignment or other disposition for value of property or services within this state" (except insurance contracts regulated under state law) *to a consumer;* or a solicitation by a supplier with respect to any of these dispositions. K.S.A. § 50–624(c) (emphasis added). A consumer "means an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for personal, family, household, business or agricultural purposes." K.S.A. § 50–624(b).

To the extent Ms. Lowe's claims are based on U.S. Bank's alleged misrepresentations to SRC and/or Collins Financial Services, those statements were not made in connection with a "consumer transaction." Instead, those alleged misrepresentations were made in connection with a non-consumer transaction between U.S.

Bank and SRC and U.S. Bank and Collins Financial Services, whereby U.S. Bank sold or disposed for value the Mercantile accounts to parties that were not consumers, as that term is defined under the Act. In *Limestone Farms, Inc. v. Deere & Co.,* 29 Kan.App.2d 609, 29 P.3d 457 (2001), the Kansas Court of Appeals found that a supplier's misrepresentations made in connection with such non-consumer transactions are not actionable under the KCPA. In *Limestone Farms, Inc.,* Tim Beim farmed on 2,000 acres of land leased from Limestone Farms on a cash rent basis. *Id.* at 459. Mr. Beim wanted to plant corn for the 1995 growing season, which needed to be in the ground no later than early May of that year. *Id.* To accomplish this task, Beim needed to purchase a planter, but because he had not established his own farming company at the time, he approached his landlord, Limestone, to purchase the planter. Limestone agreed and Mr. Beim approached Smith County Implement, Inc. d/b/a/ Phillips County Implement (PCI) to select a planter. *Id.* After negotiating a purchase price, Mr. Beim selected a John Deere planter he thought was no more than a year old. The purchase order "listed Limestone Farms as the buyer and the date of purchase was May 3, 1995." *Id.* Limestone Farm's attorney-in-fact signed the purchase agreement and paid the purchase price with a check drawn on Limestone Farms' account. *Id.* Mr. Beim's farm company, Interior Farms, L.L.C., was not formed until July of 1995. *Id.* In July of 1995, Interior Farms paid Limestone Farms for the planter. *Id.* Once Mr. Beim took possession of the planter purchased from Limestone Farms, he realized that it did not

---

As discussed later in this opinion, the uncontroverted facts establish that neither U.S. Bank nor its predecessors attempted to collect the debt after SRC exhausted its efforts. U.S. Bank, however, did sell the accounts to Collins Financial Services on or about August 21, 2000. As such, Ms. Lowe's KCPA claims asserted directly against U.S. Bank must necessarily be based on representations made to SRC and/or Collins Financial Services.

operate properly. As a result of the defect, Mr. Beim was unable to plant a full crop and was later unable to plant his milo crop for that year. *Id.* At trial, plaintiffs (Limestone, Tim Beim and Interior Farms) alleged numerous violations of the KCPA and of the Uniform Commercial Code. The trial court granted defendants' summary judgment motion on all counts and plaintiffs Tim Beim and Interior Farms, L.L.C., appealed. In affirming the grant of summary judgment on the KCPA claims, the court explained:

> As used in the KCPA, a consumer is an individual or sole proprietor who seeks or acquires property for personal, business, or agricultural purposes. K.S.A. 50–624(b). A consumer transaction includes a sale of property within the state to a consumer. K.S.A. 50–624(c). K.S.A. 50–626 prohibits a supplier from engaging in any deceptive act or practice in connection with a consumer transaction, and K.S.A. 50–627 prohibits a supplier from engaging in an unconscionable act or practice in connection with a consumer transaction. In the present case, it is undisputed Beim never personally bought nor actually acquired the planter. Thus, Beim is not a consumer; therefore, defendants were not involved in a consumer transaction with Beim, and Beim cannot maintain an action based on K.S.A. 50–626 or K.S.A. 50–627. The trial court did not err in granting defendants' motion for summary judgment on this issue.

*Id.* at 461. As in *Limestone Farms, Inc.,* Ms. Lowe never purchased or acquired a property interest in the Mercantile accounts. Instead, only SRC and Collins Financial Services acquired such interests in their transactions with U.S. Bank. SRC and Collins Financial Services were corporate entities and not "consumers" (as that term is defined under the KCPA) in those transactions. Thus, any misrepresentation that occurred between U.S. Bank and SRC

or Collins Financial Services was not made in connection with a consumer transaction and is not actionable under the KCPA. To the extent Ms. Lowe's claims are based on these transactions, they must necessarily fail. For this reason, the court grants summary judgment against Ms. Lowe's KCPA claims asserted directly against U.S. Bank.

In short, the court dismisses the KCPA claims Ms. Lowe asserts against U.S. Bank under a theory of vicarious liability because SRC and its agents were independent contractors and not employees. The court dismisses the claims asserted directly against U.S. Bank because the alleged misrepresentations were not made in connection with a consumer transaction.

## II. Invasion of Privacy by Means of Intrusion Upon Seclusion

In Ms. Lowe's second theory of recovery in the PTO, she alleges that the acts of SRC, Mr. Cash and U.S. Bank (vicariously) establish a claim of invasion of privacy by means of intrusion upon seclusion. In support of this claim, Ms. Lowe relies on the same facts supporting the alleged violations of the KCPA.

 "Generally, invasion of privacy is actionable where there is: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; or (4) publicity that unreasonably places another in a false light before the public." *Finlay v. Finlay,* 18 Kan.App.2d 479, 856 P.2d 183, 189 (1993) (citing Restatement (Second) of Torts § 652A (1976)). As to privacy claims based upon a defendant's intrusion upon seclusion, a defendant is liable if he or she intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another and the intrusion would be highly offensive to a reasonable person. *Moore*

*v. R.Z. Sims Chevrolet–Subaru, Inc.,* 241 Kan. 542, 738 P.2d 852, 856 (1987) (quoting Restatement (Second) of Torts § 652B (1976)). To recover under this particular invasion of privacy theory, however, a plaintiff must establish the existence of two conditions: "First, something in the nature of an intentional interference in the solitude or seclusion of a person's physical being, or prying into his private affairs or concerns, and second, that the intrusion would be highly offensive to a reasonable person." *Id.* at 857.

### A. Liability as to SRC and Mr. Cash

■ The court must address whether a reasonable juror could find that defendants' collection efforts constitute an intentional interference in the solitude or seclusion of Ms. Lowe's physical being or prying into her private affairs or concerns and whether such an intrusion would be highly offensive to a reasonable person. The Kansas Supreme Court has explained that an actionable invasion:

> [M]ay be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires. It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents. The intrusion itself makes the defendant subject to liability, even though there is no publication or other

use of any kind of the photograph or information outlined.

*Id.* at 857 (quoting Restatement (Second) of Torts, § 652B cmt b). However, Ms. Lowe's ability to demonstrate a highly offensive intrusion is made more difficult because she shares a creditor/debtor relationship with the defendants. In *Dawson,* the Kansas Supreme Court explained:

> In this situation it must be recognized the right to be left alone is qualified by the rights of others. When one accepts credit, the debtor impliedly consents for the creditor to take reasonable steps to pursue payment even though it may result in actual, though not actionable, invasion of privacy. In the debtor-creditor situation the right of a debtor to privacy is subject to the right of a creditor to take reasonable steps to collect the debt.

529 P.2d at 110.

■ Kansas courts have seldom addressed privacy claims in the context of collection efforts and therefore the contours of this tort remain somewhat vague. While examining the debtor's interest in his or her privacy compared with the creditor's right to pursue payment, the Kansas Supreme Court explained that " 'a creditor has a right to take reasonable action to pursue his debtor and persuade payment, although the steps taken may result to a certain degree in the invasion of the debtor's right of privacy,' but... the debtor has a cause of action for injurious conduct on the part of the creditor which exceeds the bounds of reasonableness." *Dawson,* 529 P.2d at 110–11. (quoting *Housh v. Peth,* 99 Ohio App. 485, 135 N.E.2d 440, 449 (.1955)). The issue before this court is whether a reasonable juror could find that SRC and Mr. Cash's contacts exceed the bounds of reasonableness. SRC argues that its contacts were not unreasonable, as a matter of law, because SRC never actu-

ally contacted Ms. Lowe more than twice in a day and never contacted her before 8:30 a.m. or after 8:45 p.m.[24] Moreover, SRC notes that it never attempted to contact Ms. Lowe more than three times in a single day. Likewise, Mr. Cash appears to have attempted to reach Ms. Lowe less than 10 times over a three month period and only spoke to her on two occasions. On the other hand, SRC directly contacted Ms. Lowe on at least 20 separate occasions and Mr. Cash attempted to contact Ms. Lowe on numerous occasions. SRC also sent Ms. Lowe collection letters on four separate occasions during this same time period. The defendants made these contacts despite Ms. Lowe and other family members' continued attempts to dispute the validity of the debt. Moreover, Ms. Lowe, her family members, and her attorney grandson requested that SRC and Mr. Cash stop calling her.

The court does not believe that these contacts do not, as a matter of law, exceed the bounds of reasonableness. Based on the frequency of the contacts, the continued attempts to dispute the debt, and the requests that SRC and Mr. Cash cease their collection efforts, the court believes summary judgment would be improper. For example, in *Bauer v. Ford Motor Credit Co.*, 149 F.Supp.2d 1106, a District Judge in Minnesota refused to grant summary judgment on an intrusion upon seclusion claim based upon defendants' collec-

tion efforts.[25] There, the defendants left four messages on plaintiff's answering machine, made telephone contact with four neighbors or relatives and one employer, and instigated one repossession attempt over a five-month span. *Id.* at 1109. Moreover, the plaintiffs advised Ford Motor Credit Company that the debt was erroneous and to correct its records, and when it continued to call and send letters, plaintiffs enlisted the help of the local sheriff, the postmaster and an attorney, all of whom attempted to set the defendants straight. *Id.* at 1111. In denying summary judgment, Judge Doty recognized that "a reasonable person should expect that a company charged with collecting on a delinquent account would display a certain degree of persistence when the person on the other end of the telephone denies responsibility for a debt...," but that "[u]nder these circumstances, where defendants received multiple and highly reliable confirmations of the inaccuracy of its records, the court must agree that a reasonable person could regard defendants' continued persistence, culminating in a repossession attempt at plaintiffs' home, as 'highly offensive' conduct." *Id.; see also Joseph v. J.J. Mac Intyre Companies, L.L.C.*, 238 F.Supp.2d 1158 (N.D.Cal.2002) (finding that material issues of fact existed as to whether debtor's privacy was invaded when, over 19–month period, debt collection agency made nearly 200 calls to debt-

---

**24.** The court agrees with defendants that any contacts that originated from Ms. Lowe, her family members or representatives cannot constitute an unauthorized intrusion upon her seclusion. *See e.g., Mlynek v. Household Fin. Corp.*, 2000 WL 1310666 (N.D.Ill.Sept.13, 2000) ("[O]f the three phone conversations alleged in the instant case, two were initiated by plaintiff himself, making only one a truly unauthorized intrusion."); *Bauer v. Ford Motor Credit Co.*, 149 F.Supp.2d 1106, 1110 (D.Minn.2001) (noting that while contacts initiated on behalf of plaintiff were relevant to the context of the overall collection effort,

they "cannot be included in the tally of intrusive contacts").

**25.** Minnesota law relies on the Restatement (Second) of Torts, § 652B (1977) in defining the tort of invasion of privacy. *Lake v. Wal–Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn. 1998). Kansas courts have also relied on this same Restatement section in analyzing the tort. *Moore v. R.Z. Sims Chevrolet–Subaru, Inc.*, 241 Kan. 542, 738 P.2d 852, 857 (1987). As such the *Bauer* opinion has persuasive authority.

or, who was a physically disabled senior citizen, and, on some days, made multiple calls after debtor requested that no further calls be made, that precluded summary judgment against debtor's claim for intrusion into seclusion under California law, which like the cause of action in Kansas, is founded on Restatement (Second) of Torts § 652B).[26] The court believes that the facts, when viewed in the light most favorable to the plaintiff are sufficiently similar to those in *Bauer* to justify denial of SRC and Mr. Cash's motion for summary judgment on Ms. Lowe's claim of invasion of privacy by means of intrusion upon seclusion.

### B. Liability as to U.S. Bank

 Ms. Lowe alleges that defendant U.S. Bank is vicariously liable for the acts of SRC and Ray Cash, and, therefore, asserts the invasion of privacy claim against it under that theory. As previously explained, SRC was an independent contractor and therefore U.S. Bank is not liable for its acts. It is unclear whether Ms. Lowe attempts to assert this claim directly against U.S. Bank. If so, the only allegations Ms. Lowe asserts in the PTO against U.S. Bank directly are that it misrepresented the validity of the accounts to SRC in 1997 and to Collins Financial Services in August of 2000. As discussed below, Ms. Lowe did not assert claims against U.S. Bank until May of 2002 and any claim against U.S. Bank based on its October 1997 alleged misrepresentation is

barred by the statute of limitations. *Newcomb v. Ingle*, 827 F.2d 675, 678 (10th Cir.1987) ("statute of limitations for an invasion of privacy claim in Kansas is Kan. Stat. Ann. § 60–513(a)(4) (1983) which is the two-year tort catch-all provision for actions involving 'injury to the rights of another, not arising on contract, and not herein enumerated.'"). Moreover, as discussed below, Collins Financial Services never attempted to collect the Mercantile debt from Ms. Lowe. Thus, Ms. Lowe has failed to establish that she suffered any injury as a result of U.S. Bank's alleged misrepresentation to Collins Financial Services.

### III. Intentional Infliction of Emotional Distress (Outrage)

In Ms. Lowe's third theory of recovery in the PTO, she alleges that the acts of SRC, Mr. Cash and U.S. Bank (vicariously) establish a claim of outrage. In support of this claim, Ms. Lowe relies on the same facts supporting the alleged violations of the KCPA and intrusion upon seclusion claims.

 To establish a claim of intentional infliction of emotional distress under Kansas law (often referred to as the tort of outrage), Ms. Lowe must demonstrate four elements: "(1) [t]he conduct of the defendant must be intentional or in reckless disregard of the plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between

---

**26.** The court recognizes that a different District Judge in Minnesota distinguished *Bauer* in another collection case. In *Carlson v. First Revenue Assur.*, 2002 WL 31866305 (D.Minn. Dec 19, 2002), the court granted summary judgment in favor of the defendants on Mr. Carlson's intrusion upon seclusion claim. In so doing, the "court distinguished *Bauer* because [defendant] did not receive information about the debt from third parties, only from the alleged debtor himself, and the quantity and quality of the contacts [defendant] made

were so minimal that, as a matter of law, they cannot be construed as highly offensive." *Id.* at *3. The court believes that the evidence, when viewed in the light most favorable to the defendants, is more analogous to *Bauer* than *Carlson*. SRC and Mr. Cash's contacts were more numerous than in *Carlson*. Though defendants question the nature and extent of Ms. Lowe's attempts to dispute the debt, SRC was notified of the alleged fraud by several individuals.

the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress must be extreme and severe." *Moore v. State Bank of Burden,* 240 Kan. 382, 729 P.2d 1205, 1211 (1986) (citing *Hoard v. Shawnee Mission Med. Ctr.,* 233 Kan. 267, 662 P.2d 1214 (1983)). More specifically, to survive a claim of summary judgment, "the court must, as a matter of law, first determine that reasonable fact finders might differ as to: (1) whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and (2) whether plaintiff's emotional distress was so extreme and severe that the law must intervene because no reasonable person should be expected to endure it." *Nicol v. Auburn–Washburn USD 437,* 231 F.Supp.2d 1107, 1118 (D.Kan.2002) (citing *Moore,* 729 P.2d at 1211).

## A. Extreme and Outrageous Conduct

 " 'Conduct is not extreme and outrageous' unless it is regarded as being 'beyond the bounds of decency and utterly intolerable in a civilized society.' " *Nicol,* 231 F.Supp.2d at 1118 (quoting *Moore,* 729 P.2d at 1211). Moreover, "[t]he threshold requirements for outrage causes of action are 'necessarily high to separate meritorious claims from those based on trivialities or hyperbole.' " *Id.* (quoting *Rupp v. Purolator Courier Corp.,* 790 F.Supp. 1069, 1073 (D.Kan.1992)). " 'The classic test is that liability may be found to exist when the recitation of the facts to an average citizen would arouse resentment against the actor and lead that citizen to spontaneously exclaim, Outrageous!' " *Mai v. Williams Indus., Inc.,* 899 F.Supp. 536, 542 (D.Kan.1995) (quoting *Fusaro v. First Family Mortgage Corp., Inc.,* 257 Kan. 794, 897 P.2d 123, 131 (1995)).

 Defendants contend that the only admissible evidence Ms. Lowe has concerning this claim is Mark Renne's testimony suggesting that he listened in on some of the collection calls where Mr. Cash called Ms. Lowe a "low life" and a "thief" and that such statements are not extreme and outrageous as a matter of law. *Taiwo v. Vu,* 249 Kan. 585, 822 P.2d 1024, 1029 (1991) (quoting *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175, 1179 (1981) (noting that liability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities)). In addition to this evidence, however, the court has found that Ms. Lowe has presented evidence from which a reasonable juror could conclude that SRC made other collection calls where collectors threatened to take away her home and pursue aggressive legal tactics if she did not pay the alleged debt. Moreover, Mark Renne heard Mr. Cash, in addition to his insulting comments, threaten to take Ms. Lowe's home away from her. The issue before the court is whether a rational juror could reasonably disagree as to whether these collection efforts were so extreme and outrageous that Ms. Lowe is entitled to relief. A comparison of two decisions addressing this very issue highlights the difficulty in this determination.

The Kansas Supreme Court first recognized the tort of outrage in *Dawson v. Assoc. Fin. Serv. Co. of Kansas, Inc.,* 215 Kan. 814, 529 P.2d 104 (1974). In *Dawson,* the plaintiff sought relief for injuries she sustained as a result of the defendant's ("Associates") attempt to collect payment on a used car loan. Ms. Dawson purchased a used car with proceeds from a loan she obtained through Associates. Along with the loan, Ms. Dawson purchased a disability policy from the defendant's affiliated entity. After being diagnosed with multiple sclerosis, Ms. Dawson stopped making payments on the car loan. Associates placed a call to Ms. Dawson to inquire about the payments. Because she had purchased the disability policy before

being diagnosed with MS, she informed Associates that she was no longer responsible for the debt and referred the matter to the disability policy carrier. *Id.* at 107. Soon thereafter, Ms. Dawson received a second call from Associates, during which the caller said that they were "going to repossess the car if the payments were not made". *Id.* Ms. Dawson again reiterated that she did not believe she was responsible for the payments because of the insurance policy. *Id.* A few day later, Ms. Dawson received another call from defendant and the caller asked "if she would be home that morning in order for them to come to her house and repossess the car." *Id.* Ms. Dawson indicated that they better have a court order if they wanted to repossess her car. *Id.* Mr. Byrd, an employee of Associates, "told her that a repossession would ruin her credit and make it very difficult to purchase another automobile; he was doing business with the appellant's parents which appellant understood to mean he could hurt my parents in their business; and if the car was repossessed the appellant and her parents would have to buy a bond." *Id.* Ms. Dawson told Mr. Byrd to contact her attorney. *Id.* Ms. Dawson received a fourth and final call from Mr. Byrd several days later, during which Ms. Dawson began to cry and told him not to call her again and to contact her attorney. *Id.* at 107–08. Ms. Dawson "testified that after receiving these phone calls her physical condition worsened; that is, she lost control of her bladder, could not walk without assistance and had difficulty with speech and holding objects such as dishes." *Id.* at 108. Ms. Dawson also proffered testimony from her mother that defendant contacted her (plaintiff's mother) and said they would ruin her daughter's credit. *Id.* at 113. When the tactics became more threatening, Ms. Dawson's mother proffered that she communicated the content of those telephone calls to her daughter (the plaintiff). *Id.* The trial court refused to admit the proffered testimony and eventually sustained defendant's motion for a directed verdict after finding that she had failed to produce sufficient evidence to sustain her burden of proof of any of the elements of the alleged tort; as a matter of law..." *Id.* at 109.

On appeal, the *Dawson* court recognized the tort of outrage, but acknowledged that "[w]hen one accepts credit, the debtor impliedly consents for the creditor to take reasonable steps to pursue payment even though it may result in actual, though not actionable, invasion of privacy." *Id.* at 110 (internal citations omitted). "The phrase 'reasonable action' is of course not one for which exact legal definition can be prescribed...," and "[w]hat constitutes 'reasonable' action must depend largely on the facts of the particular case." *Id.* at 111. In reviewing the facts of the case (including the proffered testimony excluded at trial) in light of this balance, the court found that a directed verdict was inappropriate, explaining:

> Certainly creditors must be permitted to pursue reasonable methods of collecting debts, and debtors are protected only from extreme and outrageous conduct. Nonetheless, methods of collecting debts which might be reasonable in some circumstances, might also be regarded as outrageous in others where it is known that the debtor is particularly susceptible to emotional distress due to a disease such as multiple sclerosis. Here the appellant made claim for payments on an insurance policy which Associates had sold her. While only the substance of the evidence excluded by the trial court was proffered, the proffer discloses Associates said to the appellant's mother 'they were going to ruin (appellant's) credit; and that when the calls from Associates became more threatening the appellant's mother talked to the appellant about them. When the details

of the evidence excluded are presented in open court, the appellant's evidence may be sufficiently strengthened to make a submissible case for the jury. Accordingly, the trial court erred in sustaining Associates' motion for a directed verdict.

*Id.* at 113.

In other situations, however, courts have granted summary judgment against a plaintiff's outrage claim despite the use of threatening and abusive collection efforts. In *Mai v. Williams Indus., Inc.*, 899 F.Supp. 536 (D.Kan.1995), for example, the court examined whether it should grant summary judgment on plaintiff's outrage claim. *Id.* at 537. In *Mai*, plaintiff was the president of PKM Steel Service, Inc. ("PKM"), a steel fabricating company based in Salina, Kansas. *Id.* at 538. PKM was a subcontractor for the construction of the Denver International Airport. *Id.* John F. Beasley Construction Company ("Beasley") was "a steel erection company based in Dallas, Texas" and a wholly-owned subsidiary of defendant Williams Industries, Inc. *Id.* Beasley was a subsubcontractor to PKM on the airport project. *Id.* "In the late spring and early summer of 1993, there was a bona fide dispute between PKM, Beasley, and M.A. Mortenson Company ('Mortenson'), a general contractor on the airport project, regarding payment and performance." *Id.* at 538. "As of early July 1993, Beasley was in default to its vendors, in default to its union on benefits due, unable to meet its labor payroll, and on the verge of defaulting on its subcontracts on the airport project." *Id.* "Mortenson had cut a joint payee check for $275,000.00 to PKM and Beasley" and defendants wanted plaintiff, Mr. Mai, to endorse the check so that Beasley could have the funds. *Id.* Mr. Mai refused and his outrage claim arose from defendants' efforts to change his mind. *Id.*

During the course of these collection efforts, defendant Frank E. Williams, Jr. left a voice mail on Mr. Mai's home machine wherein he stated that he "intended to be in Salina and take whatever steps necessary to get it done [referring to the endorsement of the Mortenson check] whether it is through the court or whatever personal intervention can happen...I don't want to be sitting in your apartment tomorrow night demanding to know why..." *Id.* at 540. Later that same evening Mr. Williams left another voice mail, wherein he stated:

I need to warn you that this whole thing is going to get exposed in the Salina Journal. I intend to call a press conference in Salina to tell the whole story. I intend to file an involuntary bankruptcy petition and I intend to file a lawsuit. I intend to put you out of business in total. I intend to take this to the National Erectors Association and advise every steel erector in the United States...You will not get another job erected anywhere. I don't think you understand the magnitude of this problem. I don't think you understand the trouble that you're in. You either sign this joint check...or all these doomsday things are going to come to pass...I will do whatever I can do to destroy PKM Steel and believe me I think you can tell by what Mortenson's agreed to do and the problems that I've created for them on the Dulles job that I'm serious, that I have a lot of people that listen to what I have to say. I think you had better start listening and you better start listening quick because if you don't, you're in a world of trouble. I hate to do this to you. I like you and I like your dad, but you will be destroyed in total. There will be no PKM Steel within the next 6 months unless you agree to sign this check and I hope that you understand this because this is not the way we

like to do business. You need to talk to DuVal tonight. He intends to call you every hour on the hour until the night is over and continue that tomorrow and I intend to call you every hour on the hour beginning at 6:00 your time tomorrow morning. Thank you.

Id. at 540–41. The following day, Mr. Williams left another message stating:

[Y]ou better agree to sign that check today, you better call our boy in Denver and tell him because I intend to be on your doorstep Monday morning and I will continue to stay there until something happens. I hope you can get the police to arrest me for trespassing because that is exactly what I want because that will trigger the press conference I'm looking for with the Salina Journal. If DuVal and Bosworth don't have the guts to do it I will. I'm not fooling, I'm not kidding, it's going to happen. You had better straighten up, you better get your act together because I will be sitting there and you will not see the last of me. PKM Steel won't find an erector to put up another job for them forever. OK. Bye.

Id. at 541. Also, on July 8, 1993, Mr. Williams conveyed the following message via facsimilie: "Unless you return my phone call before the close of business today or agree to sign over the $275,000 check, I will be permanently sitting on your doorstep or camping out in your front yard. Will arrive Kansas City U.S. Air Flight 577 at 7:45 p.m. on Sunday, July 11. Will be at your house as soon as practicable thereafter." Id.

Despite the disturbing tactics employed in the collection efforts, the court held that the facts did not rise to the level of outrage under Kansas law. In reaching this decision, the court explained:

The court has considered the following factors in rendering this decision. There was not a great disparity in power between the parties to this matter. They were experienced high-echelon business people with considerable resources and ready access to legal counsel to protect their rights. We acknowledge plaintiff's claim that defendants considered plaintiff to be inexperienced in construction disputes and a weak negotiator who became emotional in certain previous discussions. But, any hunch or idea that hardball tactics might be successful against plaintiff is distinguishable in our opinion from knowledge that a person is susceptible to emotional distress by reason of some physical or mental condition or peculiarity. The law recognizes that some behavior may be considered outrageous when committed with such knowledge. The evidence in this case does not support a claim that defendants had such knowledge or acted with the intent to cause unreasonable emotional distress.

Id. at 542 (internal citations omitted).

One of the primary factors distinguishing *Mai* from *Dawson* was the plaintiff's susceptibility to emotional distress and the defendant's knowledge of such infirmity. Indeed, the Kansas Supreme Court has reasoned that "methods of collecting debts which might be reasonable in some circumstances, might also be regarded as outrageous in others where it is known that the debtor is particularly susceptible to emotional distress due to a disease such as multiple sclerosis." *Dawson*, 529 P.2d at 113. Likewise, the court in *Mai* recognized that hardball collection tactics that fall just short of "outrageous," may cross that threshold if a collector knows that a creditor has a particular physical or mental condition that makes him or her more susceptible to injury. The court certainly does not suggest that tactics such as threatening litigation when none is forthcoming, threatening criminal prosecution, or threatening to take away a debtor's

home when it is exempt from collection efforts are not actionable under some theory (indeed, they are, here, under the KCPA), but such statements in the context of this case are not "so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Neufeldt v. L.R. Foy Const. Co., Inc.*, 236 Kan. 664, 693 P.2d 1194, 1197 (1985) (stating the test for extreme and outrageous conduct). Of crucial importance is Ms. Lowe's physical and mental status, which has the potential to render such threats outrageous. The parties do not dispute that Ms. Lowe is an elderly women who has been diagnosed with Alzheimer's disease subsequent to the collection efforts that are the subject of this lawsuit and that she has recently been admitted to a 24–hour professional nursing home facility. The court, however, believes that the pivotal issue is whether or not defendants knew or had reason to know that Ms. Lowe was particularly vulnerable to emotional distress at the time of the events in question. If they had known or had reason to know of such vulnerability, then a reasonable juror could find that the defendants' alleged threats exceeded the bounds of decency in light of Ms. Lowe's mental condition. But, the evidence in that regard is absent.

SRC argues that none of its records indicate Ms. Lowe's age or that she suffered from any disability. Ms. Lowe, however, notes that SRC's own computer records prove that SRC knew she was susceptible. Ms. Lowe cites specifically to telephone record entries dated October 16, and 20, 1999; November 2, and 8, 1999; and December 8, 10, and 17, 1999. These entries establish clearly that her attorney was handling the collection matter, but they do not suggest and one cannot reasonably infer that an attorney was handling the matter because Ms. Lowe suffered from debilitating mental condition that made her susceptible to emotional distress. While one of the telephone entries suggests that Ms. Lowe's daughter told SRC that her mother was "too old to be bothered," this does not suggest any particular susceptibility to emotional distress. Thus, unlike *Dawson*, where the collection agency had full knowledge that the plaintiff was battling a disease that made her susceptible to emotional distress and particularly vulnerable to aggressive collection tactics, under the record for summary judgment purposes there is no evidence that either SRC or its agents had knowledge of Ms. Lowe's mental condition.

 In short, the court does not believe that defendants' collection tactics rise to the level of extreme and outrageous conduct when Ms. Lowe has failed to offer evidence suggesting that the defendants knew she was particularly vulnerable. As such, the court grants summary judgment as to Ms. Lowe's outrage claim.[27]

### B. Extreme and Severe Emotional Distress

 "The second threshold requirement which must be met and which the court must first determine as present is that the plaintiff's emotional distress is sufficiently severe, genuine and extreme that no reasonable person should be expected to endure it." *Taiwo v. Vu*, 249 Kan. 585, 822 P.2d 1024, 1030 (1991).

---

27. As with the invasion of privacy claim, it is unclear whether Ms. Lowe is asserting the outrage claim directly against U.S. Bank. If so, just as with the invasion of privacy claim, the outrage claim based on representations the bank made to SRC in 1997 is time barred and the claim based on representations to Collins Financial Services is not actionable because Ms. Lowe suffered no injury.

"Emotional distress passes under various names such as mental suffering, mental anguish, nervous shock, and includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, embarrassment, anger, chagrin, disappointment, and worry... However, it is only when emotional distress is extreme that possible liability arises." *Id.* "The extreme distress required must be reasonable and justified under the circumstances, and there can be no liability where the plaintiff has appeared to suffer exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor had knowledge." *Id.* In short, the plaintiff's "emotional distress must in fact exist, and it must be severe." *Id.*

Here, Ms. Lowe has offered evidence that she suffered stress, loss of sleep, fright, and other distress that caused her to cry, shake and lose sleep. On the other hand, Ms. Lowe never consulted a doctor or a mental health professional concerning this distress and she did not mention the collection calls to her treating physician. Moreover, her distress was not manifested in as severe or extreme a fashion as the plaintiff in *Dawson,* who suffered physical symptoms such as loss of bladder control, inability to walk without assistance and difficulty with speech and her ability to grasp objects. 529 P.2d at 108. The court does not believe that Ms. Lowe has demonstrated a genuine issue of material fact that she suffered distress so severe and extreme that the law must intervene because no reasonable person should be expected to endure it.[28]

## IV. Negligent Hiring, Retention and Supervision Claims

In Ms. Lowe's fourth, fifth and sixth theories of recovery in the PTO she asserts claims of negligent hiring, retention and supervision against SRC and U.S. Bank. The claims asserted against SRC are based on its hiring, retention and supervision of Ray Cash. The claims asserted against U.S. Bank are based on its contracting with SRC.

The tort of negligent supervision is separate and distinct from the torts of negligent hiring and negligent retention. *Miller v. Dillard's, Inc.,* 166 F.Supp.2d 1326, 1331 (D.Kan.2001) (citing *Anspach v. Tomkins Ind., Inc.,* 817 F.Supp. 1499, 1519–20 (D.Kan.1993)). Kansas has long recognized a cause of action for negligent hiring. Under Kansas Law, "[a]n employer may be held liable for injuries to a third party which are the result of the unfitness or incompetence of the employee." *Prugue v. Monley,* 29 Kan.App.2d 635, 28 P.3d 1046, 1049 (2001). "The employer is negligent in hiring or retaining such an employee when the employer knew or should have known of the employee's incompetence or unfitness." *Id.* at 1050 (citing *Schmidt v. HTG, Inc.,* 265 Kan. 372, 961 P.2d 677 (1998)). Likewise, Kansas law recognizes a claim against an employer for its negligent supervision or retention of an employee who injures a non-employee third party. *Beam v. Concord Hospitality, Inc.,* 873 F.Supp. 491, 503 (D.Kan.1994).

**28.** In some situations a defendant's conduct may be so extreme and outrageous that the plaintiff's burden to show extreme distress is minimized. *Taiwo,* 822 P.2d at 1031 ("rule stated is not, however, limited to cases where there has been bodily harm; and if the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone, without such harm...In such cases the court may perhaps tend to look for more in the way of outrage as a guarantee that the claim is genuine; but if the enormity of the outrage carries conviction that there has in fact been severe emotional distress, bodily harm is not required"). This is not such a case.

### A. Claims Asserted against SRC [29]

■ Ms. Lowe alleges that SRC negligently hired Mr. Cash because it knew he had a history of untruthfulness and difficulty following management directions. SRC argues that Ms. Lowe has failed to create a genuine issue of material fact regarding whether SRC knew or should have known that its employee had a dangerous propensity and nevertheless negligently employed him.

On summary judgment, the only evidence Ms. Lowe offers in support of this claim is that Mr. Cash lied about his education in his resume.[30] The court finds that Ms. Lowe's evidence fails to state a claim against SRC on a negligent hiring theory for two reasons. First, Ms. Lowe has not offered any specific evidence suggesting that SRC knew Mr. Cash misrepresented his educational qualifications. Though SRC might have been able to identify the misrepresentation had it conducted a thorough background check, the Kansas Supreme Court has made clear that none of the Kansas negligent hiring decisions "should be unduly extended to find that a duty comes into existence whereby an employer must ascertain the detailed history of every employee, whether criminal or not, and terminate the employment of an individual who is performing acceptable services and is clearly not unfit or incompetent, but who does pose some degree of risk due to previous actions." *Schmidt v. HTG, Inc.*, 265 Kan. 372, 961 P.2d 677, 695 (1998). Second, there is no causal link

---

**29.** SRC contends that these negligence claims are barred by the applicable statute of limitations. However, Ms. Lowe originally filed claims against SRC based upon a theory of vicarious liability for the alleged wrongful conduct of Mr. Cash on April 4, 2001. While neither party addresses the issue, Ms. Lowe's negligence claims potentially relate back to the date of this filing. In *Graboi v. Kibel*, 432 F.Supp. 572, 575–76 (S.D.N.Y.1977), for example, the plaintiff, who had been raped by defendant's employee in defendant's apartment building, originally alleged breach of contract and vicarious liability for the employee's tort. Plaintiff amended the complaint to a negligent hiring claim. The court applied the relation back theory after finding that the negligent hiring claim was sufficiently similar to the original claim of vicarious liability to place the defendant on notice. Because the court finds that Ms. Lowe has failed to state a claim against SRC on these negligence claims in any event, it need not address the statute of limitations argument and the matter of relation back as to the claims against SRC.

**30.** Ms. Lowe argues that SRC "presents no summary judgment facts to rebut plaintiff's theory," and that she need only produce evidence "after the movant makes a prima facie showing." Ms. Lowe's statement of the burden on summary judgment is not completely accurate. On summary judgment, the moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence by the other party on an essential element of that party's claim. *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler*, 144 F.3d at 671). Here SRC has pointed out a lack of evidence to support the negligence claims and therefore the burden shifted to Ms. Lowe to "set forth specific facts showing that there is a genuine issue for trial." In her reply, the only facts she sets forth is evidence regarding Mr. Cash's misrepresentation contained in his resume. Ms. Lowe states that "[i]f this goes to trial, plaintiff believes that there will be evidence that defendant kept Cash because of his aggressive tactics." She does not offer any evidence to support this allegation and the court, therefore, does not consider it for purposes of summary judgment. Ms. Lowe also notes that she "intends to present facts of a pattern of Surpas abusing the public," but she fails to explain how such evidence is relevant specifically to her negligence claims.

between this misrepresentation and Mr. Cash's alleged wrongful conduct. That is, just because he told SRC that he had a master's degree, when in fact he only had a master's certification, does not suggest that he posed an undue risk of engaging in unlawful collection tactics. Under Kansas law, the tort of negligent hiring necessitates such a causal connection. *Schmidt*, 961 P.2d at 680 ("[T]here must be some causal relationship between the dangerous propensity or quality of the employee, of which the employer has or should have knowledge, and the injuries suffered by the third person; the employer must, by virtue of knowledge of his employee's particular quality or propensity, have reason to believe that an undue risk of harm exists to others as a result of the continued employment of that employee; and the harm which results must be within the risk created by the known propensity for the employer to be liable"). For these two reasons, the court finds that Ms. Lowe has failed to demonstrate a genuine issue of material fact on her negligent hiring claim against SRC.

 The court also finds that Ms. Lowe has failed to demonstrate a genuine issue as to the negligent retention and supervision claims. A reasonable juror could hold SRC liable for negligently retaining and/or failing to supervise Mr. Cash if it knew or should have known of his incompetence or unfitness. *Prugue v. Monley*, 29 Kan.App.2d 635, 28 P.3d 1046, 1050 (2001). SRC argues that it lacked such knowledge. As stated above, SRC had no reason to know that Mr. Cash allegedly was susceptible to commit unlawful collection practices when it hired him. Ms. Lowe, however, offers evidence that SRC realized his propensity to violate col-

lection laws when its general counsel listened in on some of his collection calls on January 12, 2000; January 13, 2000; and February 25, 2000.[31] During these calls, SRC's general counsel heard Mr. Cash employ collection techniques that violated provisions of the Fair Debt Collection Practices Act. SRC monitored Mr. Cash's calls near the end of its efforts to collect debt from Ms. Lowe, which began on October 16, 1999 and ended on January 21, 2000. As such, this evidence does not suggest that SRC knew or should have known that Mr. Cash posed an undue risk of violating collection laws during the time it attempted to collect debt from Ms. Lowe. Moreover, SRC explains that after learning about Mr. Cash's failure to comply with collection laws, it disciplined him and when Mr. Cash again engaged in similar behavior, SRC terminated his employment. Even after viewing the evidence in the light most favorable to the plaintiff, there is simply no evidence that SRC knew or should have known that Mr. Cash posed a threat to debtors during the time he contacted Ms. Lowe. As such, the court grants summary judgment in favor of SRC on Ms. Lowe's negligent retention and supervision claims.

**B. Claims asserted against U.S. Bank**

 Ms. Lowe also asserts negligent hiring, retention and supervision claims against U.S. Bank based on its hiring of SRC. Because SRC was an independent contractor to U.S. Bank, its duties are defined under the Restatement (Second) of Torts § 411, which provides that "[a]n employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a

---

**31.** SRC moves to strike this evidence because Ms. Lowe failed to authenticate properly the internal memorandum that discusses these monitored calls. Because the court ultimate-ly grants SRC and Mr. Cash's motion for summary judgment on these claims, the court declines to reach defendants' evidentiary argument.

competent and careful contractor (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the employer owes to third persons." The Kansas Court of Appeals adopted this Restatement rule in *McDonnell v. Music Stand, Inc.*, 20 Kan.App.2d 287, 886 P.2d 895, 900 (1994). The court need not address the substantive merit of the claim, however, because Ms. Lowe failed to assert the negligence claims against U.S. Bank within the applicable statute of limitations.

▐▐▐ Under Kansas law, the appropriate statute of limitations period for negligence claims is governed by K.S.A. § 60–513(a)(4), which provides that actions must be brought within two years. *Univ. of Kansas Memorial Corp. v. Kansas Power and Light Co.*, 31 Kan.App.2d 177, 61 P.3d 741, 744 (2003). Subsection (b) provides that the cause of action "shall not be deemed to have *accrued* until the act giving rise to the cause of action first causes *substantial injury*, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party." K.S.A. § 60–513(b). Kansas Courts have construed the phrase "substantial injury" to mean "actionable injury." *Roe v. Diefendorf*, 236 Kan. 218, 689 P.2d 855, Syl. ¶ 2 (1984). Moreover, "a cause of action accrues, so as to start the running of the statute of limitations, as soon as the right to maintain a legal action arises..." and "[t]he true test to determine when an action accrues is that point in time at which the plaintiff could first

have filed and prosecuted his action to a successful conclusion." *Kansas Public Employees Retirement Sys. v. Reimer & Koger Assoc., Inc.*, 262 Kan. 110, 936 P.2d 714, 719 (1997).

U.S. Bank notes that SRC's collection activities ceased on January 21, 2000 [32] and the limitation period for Ms. Lowe's negligence claims, therefore, expired on January 21, 2002. Because Ms. Lowe did not assert any claims against U.S. Bank until she filed her motion to amend on May 20, 2002, her negligence claims are barred under Kansas law.

▐▐▐ Additionally, even though Ms. Lowe originally filed suit against SRC, Ray Cash, and John and Jane Does 1–5, on April 2, 2001, her claims against U.S. Bank do not relate back to that date. Federal rules recognize that an amendment will relate back to an earlier filing when, among other factors:

> the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) *knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.*

Fed.R.Civ.P. 15(c)(3). "Where a plaintiff's failure to name a defendant stems from lack of knowledge rather than a mistake in identification, the plain language of Rule 15(c)(3) does not permit relation back." *In re Estate of Kout v. United States*, 241 F.Supp.2d 1183 (D.Kan.2002) (citing *Henry v. Fed. Deposit Ins. Corp.*, 168 F.R.D. 55, 59 (D.Kan.1996); *Mitchell v. Unified*

---

**32.** Ms. Lowe notes that SRC attempted to collect on the accounts on May 1, 2001. The undisputed evidence, however, at best establishes that SRC accidentally placed this call (because it had long since closed its collection efforts) and in any event no one answered the

call. There is no evidence suggesting that SRC contacted Ms. Lowe between January 21, 2000 and May 1, 2001 and Ms. Lowe has alleged no injury or actionable claim based on this unanswered call on May 1, 2001.

*Gov.,* 2000 WL 1920036 (D.Kan. Dec.21, 2000)). "[T]he Tenth Circuit has recognized...the replacement of a John Doe defendant with a named party constitutes the substitution of a party rather than the correction of a misnomer." *Wesley v. Don Stein Buick, Inc.,* 42 F.Supp.2d 1192, 1198 (D.Kan.1999) (citing *Watson v. Unipress, Inc.,* 733 F.2d 1386, 1389 (10th Cir.1984)). "Moreover, this court has previously held that an amended complaint replacing an unnamed defendant with a named party does not relate back to the date on which the original complaint was filed because the naming of John Doe as a defendant does not constitute a mistake in identification." *Id.* (citing *Henry,* 168 F.R.D. at 60; *Alexander v. Beech Aircraft Corp.,* 952 F.2d 1215, 1226–27 (10th Cir.1991)). As such, Ms. Lowe's substitution of U.S. Bank for John and Jane Does does not satisfy the relation back requirements set forth in Fed. Rule Civ. P. 15(c).

■ Ms. Lowe contends that the statute of limitations period should be tolled for a variety of reasons. First, she argues that she is disabled and the tolling provisions under K.S.A. § 60–515 apply. This tolling provision provides:

> [I]f any person entitled to bring an action, other than for the recovery of real property or a penalty or a forfeiture, at the time the cause of action accrued or at any time during the period the statute of limitations is running, is ...an *incapacitated person...* such person shall be entitled to bring such action within one year after the person's disability is removed, except that no such action shall be commenced by or on behalf of any person under the disability more than eight years after the time of the act giving rise to the cause of action.

K.S.A. § 60–515(a). The Legislature has provided that in construing the statutes of the state of Kansas:

> 'Incapacitated person' means an individual whose ability to receive and evaluate relevant information, or to effectively communicate decisions, or both, even with the use of assistive technologies or other supports, is impaired to the degree that the person lacks the capacity to manage the person's estate, or to meet essential needs for the person's physical health, safety or welfare, as defined in K.S.A.2002 Supp. 59–3051, and amendments thereto, whether or not a guardian or a conservator has been appointed for that person.

K.S.A. § 77–201(Thirty First).

■ Ms. Lowe argues that Alzheimer's disease has rendered her incapacitated since 1997. The court finds this argument unpersuasive for two reasons. First, Ms. Lowe did not allege or include any claim of disability and/or incapacity in her complaint, nor did she suggest in the PTO that her disability was a defense to the statute of limitations. Under Kansas law, a party seeking to raise the tolling provisions provided by K.S.A. § 60–515 must assert the facts justifying its application in the complaint and, if not, an injured party stands in the position of a person possessing the attributes of a person with legal capacity. *Seymour v. Lofgreen,* 209 Kan. 72, 495 P.2d 969, 974 (1972) ("[w]here the injured party does not assert legal incapacity as a cause for delay in commencing an action in court, such injured party stands in the position of a person possessing the attributes of a person with legal capacity, when confronted with the two-year statute of limitations in a negligence action"); *Gardner v. Toyota Motor Sales, U.S.A., Inc.,* 793 F.Supp. 287, 289–90 (D.Kan.1992) ("Under Kansas law, a party seeking to raise the tolling provisions provided by 60–515 must assert the facts justifying its application in his complaint"); *Storts v. Hardee's Food Sys., Inc.,* 919 F.Supp. 1513, 1522 (D.Kan.1996) (same). Second,

if Ms. Lowe was and continues to be legally incapacitated, she lacks capacity to sue. *See, e.g., In Interest of Baby Boy Bryant*, 9 Kan.App.2d 768, 689 P.2d 1203 (1984) (noting that Guardian is only person with capacity to make or communicate responsible decisions on behalf of incompetent or to maintain suit on behalf of ward); *Brice Nash v. Brice Nash*, 5 Kan.App.2d 332, 615 P.2d 836 (1980) (finding that judgment rendered, under provisions of probate code, that husband was incapacitated person and required guardian and conservator was conclusive and binding on trial court in divorce action; accordingly, trial court properly determined that husband lacked requisite capacity to file suit for divorce in his own name). Thus, if she is truly incapacitated and a legal guardian did not bring suit on her behalf, then the entire complaint should be dismissed.

 Second, Ms. Lowe contends that even if the tolling provision in K.S.A. § 60–515 does not apply, the limitation period should be tolled because she was unable to ascertain the cause and nature of her injuries until 2002. Specifically, Ms. Lowe argues that she was unable to identify the culpable party because: (1) "Mercantile was undergoing repeated corporate name and address changes;" (2) "Mercantile was double cloaking [its] conduct by using surrogate collection entities;" and (3) "plaintiff was deceived into thinking her troubles with Mercantile were resolved in 1999 when Mercantile admitted that the debts were the result of fraud and instructed all the major Credit Reporting Agencies to remove all the derogatory information from plaintiff's credit histories." The undisputed evidence, however, clearly indicates that Ms. Lowe was receiving collection calls from SRC from October 16, 1999 through January 21, 2000 and that she complained of these calls to her attorney grandson, James Renne, throughout that time period. Moreover, James Renne admitted in his deposition testimony that he first learned SRC was attempting to collect on the two Mercantile credit card accounts on November 10, 1999. This testimony is corroborated by the transcript of a November 5, 1999 telephone conversation between James Renne and SRC employee, Cassandra Bailey:

> Mr. Renne: What account is this supposedly for?
>
> Ms. Bailey: You don't even know what you're talking about. I cannot disclose that information till it's okay with her.
>
> Mr. Renne: She gives me permission to have it. I'm her power of attorney.
>
> Ms. Bailey: Okay. This is her Mercantile Bank of Illinois account.
>
> Mr. Renne: Mercantile?
>
> Ms. Bailey: That's correct.

As such, Ms. Lowe, via her attorney grandson, knew or reasonably could have ascertained Mercantile's identity no later than November 10, 1999.[33] Therefore to

---

**33.** James Renne has alleged in his affidavit that "Dorothy Lowe was not able to ascertain what, if any her causes of action, or even injuries, might be until March 2002." He argues that it was not until Elan Financial was served with a subpoena that he could determine that Mercantile's successors, and therefore Mercantile, were involved. This affidavit contradicts his prior deposition testimony. "There is authority for the proposition that in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements." *Lantec, Inc. v. No-*

*vell, Inc.*, 306 F.3d 1003, 1016 (10th Cir.2002) (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986)). "In assessing conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Id.* "In deciding whether an affidavit is an attempt to create a sham issue of fact", the relevant factors are "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and

the extent that Mercantile engaged in name changes, "cloaking," or deception about the status of Ms. Lowe's accounts, she knew or could have known that Mercantile was the responsible party as of November 10, 1999.

Third, Ms. Lowe contends that the limitation period should be tolled because Mercantile concealed its identity.[34] The Kansas statute provides:

> If when a cause of action accrues against a person he or she be out of the state, or has absconded or concealed himself or herself, the period limited for the commencement of the action shall not begin to run until such person comes into the state, or while he or she is so absconded or concealed, and if after the cause of action accrues he or she depart from the state, or abscond or conceal himself or herself, the time of the absence or concealment shall not be computed as any part of the period within which the action must be brought.

K.S.A. § 60–517. However, "[t]he mere inability of a plaintiff to locate a defendant where there has been no attempt by defendant to conceal himself is not sufficient to establish concealment within the meaning of the tolling statute." *Hogue v. Johnson,* 28 Kan.App.2d 334, 17 P.3d 364, 367 (1999).

Here, the evidence clearly establishes that Mercantile did not actively attempt to conceal its identity from Ms. Lowe, but instead, she simply failed to investigate Mercantile's corporate changes. As explained above, SRC informed Ms. Lowe

that it was collecting Mercantile debt as early as November 11, 1999. Moreover, during the entire time SRC was attempting to collect Mercantile debt from Ms. Lowe (October, 1999 through January, 2000) the bank operated under the Mercantile name. Mercantile changed its name to Firstar Bank effective March 10, 2000, nearly two months after SRC's last efforts to collect the debt. Firstar merged with and into U.S. Bank effective August 9, 2001. The bank made no attempt to conceal its identity. The name changes and mergers were known to the public and Ms. Lowe would have discovered these changes upon conducting a reasonable investigation. In fact, Ms. Lowe has offered no evidence that she even attempted to identify the allegedly culpable party, i.e. the underlying creditor, at any time between January 21, 2000 and January 21, 2002. In light of this evidence, the limitation period is not subject to tolling under K.S.A. § 60–517.

Finally, Ms. Lowe contends that the acts of U.S. Bank constitute continuing harms or violations that extend the limitation period. Where applicable, the doctrine provides that when the last act of wrongful conduct is part of an ongoing pattern and occurs within the filing period, allegations concerning earlier acts are not time-barred. *Renteria v. Donahue,* 92 F.3d 1197, 1996 WL 446905, at *2 n. 4 (10th Cir. Aug.8, 1996). Here, Ms. Lowe has failed to cite any authority suggesting the doctrine applies generally to negli-

---

whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* James Renne's affidavit statements are not based on newly discovered evidence that was not available at the time of his deposition. Moreover, the statements do not attempt to clarify confusion in that testimony, nor do they supplement his statements concerning his knowledge on November 10, 1999. In light of these facts, the court must disregard

these statements as they conflict with his deposition testimony.

**34.** It is unclear whether Ms. Lowe asserts this statutory argument as an independent grounds for tolling or as further support of the argument that the corporate name changes and employment of independent contractors to collect the debt justify equitable tolling.

gence claims. To the contrary, "[t]he doctrine is a narrow concept that must be limited to a distinct group of cases..." *United Cities Gas Co. v. Brock Exploration Co.*, 984 F.Supp. 1379, 1389 (D.Kan. 1997). "[T]he continuing violation doctrine has been applied very infrequently outside the Title VII employment discrimination context..." and "[t]he limited areas in which courts have broadened the doctrine's application have involved explicit statutory language, unequivocal legislative intent, or contractual arrangements." *Id.* at 1388 (internal citations omitted). Ms. Lowe has failed to identify the presence of any of these factors.[35]

## V. General Negligence Claim Against U.S. Bank

In addition to the negligent hiring, retention and supervision claims, Ms. Lowe asserts a claim of general negligence in her seventh theory of relief in the PTO. Ms. Lowe alleges that U.S. Bank owed Ms. Lowe a duty of care when it undertook its collection efforts, which it breached by continuing to seek collection on the accounts when it knew or reasonably should have known that the debt was invalid. U.S. Bank contends that the claim is barred by the statute of limitations period or is otherwise not actionable.

Essentially, Ms. Lowe contends that U.S. Bank was negligent in retaining SRC to collect debt it knew or reasonably should have known was invalid. To the extent that this claim relies on SRC's collection efforts, it is barred by the statute of limitations. As noted above, SRC's last collection effort occurred on January 21, 2000. Ms. Lowe did not amend her complaint to add U.S. Bank until June of 2002, several months past the limitation period set forth in K.S.A. § 60–513(a)(4).

Ms. Lowe, however, also alleges that U.S. Bank again breached its duty when it sold the accounts to Collins Financial Services on August 21, 2000. This claim is not barred by the applicable limitation period. Even so, Ms. Lowe has failed to demonstrate that there is a genuine issue of material fact as to this claim. The uncontroverted facts establish that while U.S. Bank (Firstar at the time) sold those accounts, it repurchased them when SRC notified U.S. Bank, on April 12, 2002, that Ms. Lowe had sued SRC for alleged improper collection practices. Moreover, U.S. Bank has offered uncontroverted evidence that Collins Financial Services did not make any collection efforts or have any correspondence with Ms. Lowe. She contends, however, that "Mercantile, having known or [knowing], and even admitt[ing], that the credit card accounts in question were invalid, apparently sold those accounts to Collins Financial with full knowledge that Collins would most likely engage in unwarranted collection efforts with all its consequences..." Even if this evidence would establish a breach of U.S. Bank's alleged duty, it does not establish any injury proximately caused by such a breach. If Collins Financial Services did not engage in any collection efforts, Ms. Lowe suffered no injury. As such, Ms. Lowe has failed to establish a genuine issue of

---

**35.** Even if the continuing violation doctrine were to apply in this case, Ms. Lowe's claims are not timely because the last act in the series of SRC's collection efforts expired on January 21, 2000. Ms. Lowe argues that in August of 2000, Mercantile unlawfully sold the account to Collins Financial, which perpetuated the cycle of collection efforts. The court does not believe that the wrongful sale of an account to another financial entity is sufficiently similar to unlawful collection efforts so as to constitute substantially the same misconduct that might warrant application of the doctrine. Moreover, as discussed below, the uncontroverted evidence establishes that Collins Financial never attempted to collect on the accounts.

material fact based upon the sale of the Mercantile accounts to Collins Financial and summary judgment is granted on this claim. *Davey v. Hedden,* 260 Kan. 413, 920 P.2d 420, 429 (1996) (to maintain a cause of action in negligence, plaintiff must establish a duty, a breach of the duty, that injury resulted from the breach, and that the breach proximately caused the injury).

## VI. Fair Credit Reporting Act Claims

Ms. Lowe argues, in her eighth theory of recovery in the Pretrial Order, that U.S. Bank violated provisions of the Fair Credit Reporting Act ("FCRA"). U.S. Bank argues that Ms. Lowe has failed to demonstrate a genuine issue of material fact as to any violation of the Act and alternatively that any such claim is barred by the statute of limitations.

### A. Genuine Issue of Material Fact as to FCRA Claims

█ Congress enacted the FCRA "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information...." 15 U.S.C. § 1681(b); *see also Matthiesen v. Banc One Mortg. Corp.,* 173 F.3d 1242, 1245 (10th Cir.1999). In furtherance of this objective, the "FCRA places distinct obligations on three types of entities: (1) consumer reporting agencies; (2) users of consumer reports; and (3) furnishers of information to consumer reporting agencies". *Aklagi v. Nationscredit Fin.,* 196 F.Supp.2d 1186, 1192 (D.Kan.2002) (citing *Carney v. Experian Info. Solutions, Inc.,* 57 F.Supp.2d 496, 500 (W.D.Tenn.1999)).

Here, U.S. Bank is a furnisher of credit information "and, as such, its obligations are set forth in 15 U.S.C. § 1681s–2." *Id.* Section 1681s–2 imposes two general sets

of duties on providers of credit information. First, under § 1681s–2(a), U.S. Bank has a duty to provide accurate information to a credit reporting agency. Second, under 1681s–2(b), U.S. Bank has a duty, after receiving notice from a consumer reporting agency of a dispute regarding the completeness or accuracy of an account, to (1) conduct an investigation with respect to the disputed information;(2) review all relevant information provided by the consumer reporting agency; (3) report the results of the investigation to the consumer reporting agency; and (4) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and compile and maintain files on consumers on a nationwide basis. 15 U.S.C. §§ 1681s–2(b)(1)(A)–(D). Congress, however, did not create a private right of action for violations of § 1681s–2(a). *See* 15 U.S.C. § 1681s–2(c) (providing that remedy provisions "do not apply to any failure to comply with subsection (a) of this section, except as provided in section 1681s(c)(1)(B) of this title"); 15 U.S.C. § 1681s–2(d) (providing that subsection (a) violations "shall be enforced exclusively under section 1681s of this title by the Federal agencies and officials and the State officials identified in that section"); *Aklagi,* 196 F.Supp.2d at 1192 (recognizing that no private right of action exists for subsection (a) violations). Thus, Ms. Lowe's FCRA claim must necessarily be founded upon a violation of subsection (b).

█ Under 15 U.S.C. § 1681s–2(b), U.S. Bank is required to conduct an investigation "[a]fter receiving notice pursuant to section 1681i(a)(2) of this title of a dispute" regarding the accuracy of information it provided to a consumer reporting agency. § 1681s–2(b)(1) *Aklagi,* 196 F.Supp.2d at 1196. Section 1681i(a)(2)(A)

requires a consumer reporting agency, within five business days from receiving the consumer's dispute, to notify any person who provided any relevant item of information about the dispute (allegedly U.S. Bank in this case). Courts have consistently held that this duty is triggered "only after the furnisher [allegedly U.S. Bank in this case] receives notice of the dispute from a consumer reporting agency, not just the consumer." *Aklagi*, 196 F.Supp.2d at 1193 (citing *Hasvold v. First USA Bank*, 194 F.Supp.2d 1228, 1236 (D.Wyo.2002); *Scott v. Amex/Centurion S&T*, Nos. 3:01–CV–1594–H et al., 2001 WL 1645362, at *4 (N.D.Tex. Dec.18, 2001); *Fino v. Key Bank*, No. Civ. A. 00–375E, 2001 WL 849700, at *5 (W.D.Pa. July 27, 2001); *Jaramillo v. Experian Info. Solutions, Inc.*, 155 F.Supp.2d 356, 363 (E.D.Pa.2001); *Yelder v. Credit Bureau of Montgomery, L.L.C.*, 131 F.Supp.2d 1275, 1289 (M.D.Ala.2001); *Dornhecker v. Ameritech Corp.*, 99 F.Supp.2d 918, 928–29 (N.D.Ill.2000)). Here, U.S. Bank contends that it neither requested Ms. Lowe's credit reports nor received notice from any consumer reporting agency about a dispute concerning the Mercantile accounts. As such, U.S. Bank believes that the consumer reporting agencies never triggered its duty to investigate the validity of the Mercantile accounts. Ms. Lowe, however, has attached letters mailed by James Renne to four credit reporting agencies that dispute various accounts, including those with Mercantile Bank. These letters triggered the consumer reporting agencies' duty to notify Mercantile that Ms. Lowe had disputed the validity of the debt. 15 U.S.C. § 1681i(a)(2). While it is possible that none of the four consumer reporting agencies Ms. Lowe contacted complied with

federal law or that they never actually received the letters, the credit reporting agencies notified Ms. Lowe, after conducting their investigations, that the Mercantile debts had been deleted from her credit report.[36] This evidence would provide circumstantial evidence that both these agencies actually received the dispute letters from Ms. Lowe and that they contacted Mercantile regarding the dispute. As such, the court finds that Ms. Lowe has demonstrated a genuine issue of material fact as to the existence of an FCRA violation.

## B. Statute of Limitations

■ The FCRA includes a two-year limitation period. The relevant provision contemplates:

An action to enforce any liability created under this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within two years from the date on which the liability arises, except that where a defendant has materially and willfully misrepresented any information required under this subchapter to be disclosed to an individual and the information so misrepresented is material to the establishment of the defendant's liability to that individual under this subchapter, the action may be brought at any time within two years after discovery by the individual of the misrepresentation.

15 U.S.C. § 1681p. Here, liability arose when U.S. Bank allegedly failed to investigate the claims in September or October of 1999. Thus, the limitation period on Ms. Lowe's claims expired sometime in the fall

---

**36.** U.S. Bank raises the lack of authentication of these credit reports and contends that the credit reports are hearsay. For purposes of this summary judgment motion, the court will not address those arguments because the court grants U.S. Bank's motion on statute of limitations grounds in any event.

of 2001. She did not move to amend her complaint to add U.S. Bank until May 20, 2002. Thus, her claim is time barred, unless the tolling provision contained in § 1681p applies.

▆▆▆▆ It is important to note that Ms. Lowe's discovery rule and equitable tolling arguments do not apply to her FCRA claims. "Congress provided in the FCRA that the two-year statute of limitations runs from 'the date on which the liability arises,' subject to a single exception for cases involving a defendant's willful misrepresentation of material information," and "[t]he most natural reading of § 1681p is that Congress implicitly excluded a general discovery rule by explicitly including a more limited one." *TRW Inc. v. Andrews*, 534 U.S. 19, 28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001); *see also Clark v. State Farm Fire & Cas. Ins. Co.*, 54 F.3d 669, 672 (10th Cir.1995) (finding that "since the Act sets out the limitation period with a specific discovery exception, a 'general discovery exception' to the statute will not be applied because to do so would be contrary to the exception expressed in the statute"); *Rylewicz v. Beaton Serv., Ltd.*, 888 F.2d 1175, 1181 (7th Cir.1989) (equitable tolling or discovery exception may not be read into the statute); *Houghton v. Ins. Crime Prevention Inst.*, 795 F.2d 322, 325 (3d Cir.1986) (same). Therefore, only the express tolling provision contained in the FCRA can save Ms. Lowe's claim. As such, the court must determine whether U.S. Bank "materially and willfully misrepresented any information" required under the Act, and if so whether the information so misrepresented was "material to the establishment of the defendant's liability to that individual."

Ms. Lowe argues that when Mercantile deleted its accounts from her credit reports in late September of 1999, it misrepresented its belief that the accounts were invalid. That is, it communicated, via the credit reports, its belief that the accounts were invalid, when in fact, it actually believed that the credit card debt was legitimate. She further contends that she "relied on these misrepresentations by Mercantile in concluding that Mercantile was doing the right thing." The court is unsure whether Mercantile's acts constitute a misrepresentation (in the first place) and whether Mercantile actually communicated its representations to Ms. Lowe, thereby triggering the statutory tolling provision. Assuming that its conduct did in fact trigger the statutory tolling provision, however, Ms. Lowe could not have reasonably relied on Mercantile's representation after November 10, 1999. On that date, Ms. Lowe's attorney grandson James Renne, who also held her power of attorney, learned that Mercantile had hired SRC to collect on the Mercantile accounts. At that point, Ms. Lowe was on notice that it believed the debt was valid. Because Ms. Lowe did not file her claims against U.S. Bank until June of 2002, they are barred by the limitation period expressed in the FCRA. As such, the court grants summary judgment against Ms. Lowe's FCRA claim against U.S. Bank.

## VII. Punitive Damages

▆▆ Ms. Lowe seeks to recover punitive damages against SRC. SRC contends that she is not entitled to such damages unless SRC authorized or ratified the conduct of which Ms. Lowe complains.

▆▆▆▆ The Kansas punitive damages statute provides that "[i]n no case shall exemplary or punitive damages be assessed . . . against . . . [a] principal or employer for the acts of an agent or employee unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer." K.S.A. § 60–

3702(d)(1). "Based upon the dictionary definitions, Kansas case law, and the law of other jurisdictions, [the Kansas Supreme Court has held] that authorization under the provisions of K.S.A.1992 Supp. 60–3701(d)(1) may be either express or implied and generally is accomplished before or during the employee's questioned conduct." *Smith v. Printup,* 254 Kan. 315, 866 P.2d 985, 1003 (1993). "It may be based on an express grant of authority or on a course of conduct indicating that the employee was empowered or given the right or authority to engage in the questioned conduct." *Id.* "Ratification under the provisions of 60–3701(d)(1) may be either express or implied and may be accomplished before, during, or after the employee's questioned conduct." *Id.* "It may be based on an express ratification or based on a course of conduct indicating the approval, sanctioning, or confirmation of the questioned conduct." *Id.*

■ SRC argues that Ms. Lowe failed to identify any person with the express authority to authorize and/or ratify the questioned conduct, and that SRC did not in fact authorize the conduct. SRC offers evidence in the form of testimony from SRC's Vice President of Quality Assurance, Debra Crotwell. After reviewing the allegations in the complaint, she concludes that if SRC employees "conducted themselves as [Ms. Lowe] alleges...then that conduct was not authorized and was contrary to Surpas' policies and practices." SRC also offers evidence that it trains its employees to comply with collection laws, monitors the callers for compliance with the law, and disciplines its collectors when they violate collection regulations. Ms. Lowe argues that this evidence does not warrant summary judgment and that the acts of Mr. Cash, who was in a managerial position at SRC, sufficiently demonstrates a genuine issue of material fact as to "authorization" or "ratification." Indeed, the Kansas Supreme Court, has held that "[a]

corporation is liable for punitive damages for the tortious acts of a managerial agent acting within the scope of his employment." *Flint Hills Rural Elec. Coop. Assoc. v. Fed. Rural Elec. Ins. Corp.,* 262 Kan. 512, 521, 941 P.2d 374 (1997); *see also Lopresto v. ANR Pipeline Co.,* 1997 WL 557313, at *2 (D.Kan. Aug.27, 1997) (permitting plaintiff to amend the complaint to add punitive damage claim against defendant corporation based upon acts of employee manager because the Kansas Supreme Court recognizes that "[a] corporation is liable for punitive damages for the tortious acts of a managerial agent acting within the scope of his employment"). Moreover, "ratification and authorization are broad enough to encompass evidence that the corporate defendants knew or should have known about employee misconduct and evidence of corporate policies, procedures, *or managerial behavior* that a jury reasonably could infer implicitly authorized or ratified the questioned conduct". *Smith,* 866 P.2d at 1005 (emphasis added). The court is not prepared, at this stage of the proceedings, to conclude that Mr. Cash's managerial behavior fails to establish a genuine issue of material fact as to SRC's authorization and/or ratification. As such, SRC's motion to dismiss Ms. Lowe's claim for punitive damages is denied.

## CONCLUSION

Based on the foregoing analysis, the court, in its March 25, 2003 order, granted in part and denied in part the motion for partial summary judgment by defendant Cash (Doc. 170) and the motion for summary judgment by defendant Surpas Resource Corporation (Doc. 172) as follows: First, the court denied these defendants' motions to dismiss plaintiff's Kansas Con-

sumer Protection Act ("KCPA") claims, except for the claims based upon collection calls where plaintiff's caretaker, Ms. Hemandez, listened in on the other line (plaintiff asserts these claims in paragraphs 7a(2)a82–86 of the Final Pretrial Order ("PTO")). Second, the court denied these defendants' motions to dismiss plaintiff's invasion of privacy claim, based upon a theory of intrusion upon her seclusion. Third, the court granted these defendants' motions to dismiss plaintiff's outrage claim. Fourth, the court granted these defendants' motions to dismiss plaintiff's negligent hiring, supervision and retention claims. Finally, the court denied these defendants' motions to dismiss plaintiff's request for punitive damages.

The court further granted U.S. Bank's motion for summary judgment (Doc. 175) in its entirety. Specifically, the court granted this defendant's motion to dismiss plaintiff's KCPA claims asserted directly against U.S. Bank and those claims asserted under a theory of vicarious liability. The court granted this defendant's motion to dismiss plaintiff's negligence and tort claims as asserted in plaintiff's second through seventh theories of recovery in the PTO. Finally, the court granted this defendant's motion for summary judgment on plaintiff's federal Fair Credit Reporting Act claims.